IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

MICHAEL L. MALONE          §
                           §
VS.                        §   CIVIL ACTION NO.4:09-CV-634-Y
                           §
CITY OF FORT WORTH, TEXAS,et al.§

OPINION AND ORDER RESOLVING MOTIONS FOR SUMMARY JUDGMENT
ON THE BASIS OF QUALIFIED IMMUNITY

In this case, plaintiff Michael L. Malone has claims remaining against eleven police officers of the City of Fort Worth, Texas, individually, and against the City of Fort Worth, Texas.[1] Now pending are five motions for summary judgment based on qualified immunity. Defendants Adrian Tidwell and Samuel Davidsaver each filed their own motions; defendants Justin L. Stroud, Mark Ball, Christopher H. Watts, and Nathan S. Lehman ("the Stroud group") filed a collective summary judgment motion; so did defendants John T. Davis, James S. Fields, and Jason L. Gipson ("the Davis group"); likewise, defendants Deena Evans and Jaimy Faigan ("the Evans Group"). Each motion was supported by a brief in support and an extensive appendix. As a result of a Court order resolving objections and providing plaintiff Malone a chance to file an amended brief, Malone filed an amended brief in response to all of the summary judgment motions, along with a 367-page appendix. Also before the Court are the reply briefs filed by the defendants, and

---

[1] The Court has previously dismissed other claims and defendants through separate orders and judgments under Federal Rule of Civil Procedure 54(b). The City of Fort Worth has not filed a motion challenging Malone's claims, and the Court has thus not yet reached any claims against Fort Worth.

a supplemental reply and objections to the amended brief.

## I.  Background

Plaintiff's claims arise from a July 23, 2009, incident in which he was forcibly arrested after fleeing from Fort Worth police officers in a stolen truck for seven to eight minutes, only to be stopped on a dead-end street. All eleven of the individual officers arrived at the location either immediately or soon after Malone brought the truck to a stop. The issues to be resolved in this case arise primarily from what happened over the course of the first two minutes or so after Malone pulled the stolen pick-up truck to a stop.  But what took place during Malone's pre-stop flight is also relevant to the Court's determination.

Officer Tidwell, accompanied by a police dog, was the first officer to pull his police unit up behind Malone's truck. He was followed closely by Officer Davis, and then the other officers. What ensued was Malone's forcible removal through the driver's-side window of the truck, blows upon him by Tidwell, and a pre-and post-handcuffing attack upon him by the dog, which injured him.

Malone has causes of action remaining against the individual defendants for the use of excessive force by Officer Tidwell personally and through the use of his dog, violation of the Fourth Amendment by Officer Stroud in directing medical personnel on positioning Malone for an ambulance ride, and bystander liability

claims under the Fourth Amendment against each officer other than Tidwell. (Plaintiff's Fourth Amended Complaint (4AC), at 56-57.)

After review of all relevant materials on file, the Court concludes that although genuine disputes of material fact remain as to Plaintiff's Fourth Amendment excessive-force claim against Tidwell, and as to the bystander claims against defendants Davis, Fields, Gipson, Stroud, and Lehman, no such material-fact disputes exist as to the direct Fourth Amendment claim against Stroud, and as to the bystander-liability claims against defendants Ball, Watts, Evans, Faigin, and Davidsaver. Thus, some defendants are entitled to summary judgment and will be dismissed.

## II.  Summary-Judgment Evidence

A. Evidence Submitted by the Parties

The first summary-judgment motion filed was that of the Stroud group. In support of that motion, these defendants filed an appendix containing over 500 pages of exhibits. (Electronic Case File (ECF) doc. 190.) That appendix includes the following items, with a corresponding reference to  each item's identifying letter: a DVD recording of the dashboard camera video stream from Officer Davis's patrol vehicle ("Dash cam DVD")(A); a DVD recording of the camera video stream from a City of Fort Worth police helicopter hovering over the scene ("Aerial DVD")(B); a DVD recording of portions of the radio communications between officers pursuing

Malone in flight (C); a DVD compilation of both the aerial and dash-camera video angles onto one screen ("Compilation DVD")(D); a map of the pursuit route (F); photographs from the scene of the arrest (G); Malone's criminal records (H); a Fort Worth Police Department Incident Report (I); Malone's response to Request for Admission (J); deposition excerpts of Malone (K), Tidwell (L), Jaime Johnson (M), Davis (N), Greg Abernathy (O), Davidsaver (P), Fields (Q), Carlson B. Thompson (R)[2], Stroud (S), Ball (T), Lehman (U), and Watts; the November 21, 2013 Affidavit of Adrian W. Tidwell, with exhibit (W); the November 22, 2013 Affidavit of Justin Stroud (X); the November 22, 2013 Affidavit of Mark Ball (Y); the November 21, 2013 Affidavit of Nathan Lehman (Z); the November 22, 2013 Affidavit of Christopher Watts (AA); the November 25, 2013 Affidavit of Samuel C. Davidsaver (BB); the November 23, 2013 Affidavit of John T. Davis with exhibits (CC); and the November 23, 2013 Affidavit of James Fields (DD).

The Davis group also filed an appendix to their motion. (ECF doc. 196.) That appendix included the following evidentiary items not provided by the Stroud group: the November 23, 2013 Affidavit of Jason Gipson (FF); Medstar Records for the July 23, 2009 treatment of Malone (R)[3]; the November 19, 2013 Affidavit of City of Fort Worth detective Kathleen Westfall, with as an exhibit

---

[2]Not considered consistent with this Court's piror order resolving objections.

[3]Not considered consistent with this Court's prior order resolving objections.

thereto a DVD recording of an interview she conducted with Malone in the early morning hours of July 24, 2009 (S and T).

Davidsaver then provided complete transcripts of numerous depositions taken in this case in his appendix, which is found at ECF number 208. The Evans group also filed an appendix at ECF number 203, containing the complete deposition of most of the parties to this suit, and new evidence: the November 25, 2013 Affidavit of Jaimy Faigin (Tab 12), and the November 25, 2013 Affidavit of Deena Evans (Tab 13.)

In compliance with this Court's order, Malone submitted, at ECF number 238, an appendix in support of his amended brief. That appendix contains the following: a "still-image chronology" of still-frame, side-by-side images from both the aerial camera and the dash-cam video (Plaintiff's Appendix (PApp.), 2-40); a City of Fort Worth Internal Investigation File (PApp. 41-96); photographs of the arrest scene and Officer Tidwell's gun (PApp. 97-121); Fort Worth Police Department Canine Unit Standard Operating Procedures (excerpts) (PApp. 122-28); Fort Worth Police Department General Orders (excerpts)(PApp. 129-66); excerpts of the depositions of several representatives of the City of Fort Worth (PApp. 287-316); a Fort Worth K-9 video (PApp. 359); the July 23, 2009, K-9 Officer's Daily Activity Report for Tidwell (PApp. 360); and the January 9, 2014 Declaration of Michael D. Malone (PApp. 362.)

B. Evidence on the Video and Audio Tapes

The Supreme Court, in *Scott v. Harris,* 550 U.S. 372 (2007), held that where a videotape exists that discredits the nonmoving party's version of events so that no reasonable jury could believe it, the Court is required to view the facts in the light depicted by the videotape. Although that is not the case in the instant suit, the Court does have before it several videos in this case that provide objective facts that dramatically assist this Court, and that the Court has relied upon extensively in resolving these summary-judgment motions.

Included are two different video-camera angles of the relevant events, an audio recording of some radio transmissions, and a compilation DVD of the two camera viewpoint recordings on one image, side-by-side. The compilation DVD was created by Malone's counsel. It includes identification numbers that assist the Court in determining the location of each defendant and what each was doing throughout the events at issue. The defendants all agree that the compilation DVD accurately depicts the events and the two camera angles together, and they also have agreed to the identification numbers added to the compilation DVD to denote the ongoing location of the police dog and each party: Malone(P), Dog (D), Tidwell (1), Davis (2), Fields (3), Gipson (4), Ball (5), Watts (6), Evans (7), Faigin (8), Stroud (9), Lehman (10), and Davidsaver (11). Thus, the Court will rely extensively upon its visual review of these recordings in resolving the motions and in

6

considering the other summary-judgment evidence.

(i)– Officer Davis's Dashboard Camera--Malone Flight

Officer Davis began to pursue Malone, with his lights activated, after Davis checked the truck's license plates on his in-car computer and learned that the truck had been reported stolen. Davis called out on the radio that a vehicle pursuit had begun and gave a code indicating a stolen vehicle. Although Davis initially lost sight of Malone, he soon relocated the truck and re-activated his lights.  It was at this point that the dash-camera video began recording (7:55:43 p.m.). (PApp. at 308, Randolph Depo. at 78.)

Over the course of the next several minutes, Davis pursued Malone across major and side streets throughout the west side of Fort Worth. Davis remained directly behind Malone, at times exceeding the speed limit, running stop signs, and narrowly missing other traffic. (Dash Cam Video 7:56:00-8:02:00). At one point, Malone turned the truck into a car wash and stopped the truck for a few seconds, at which point Davis was no longer immediately behind Malone. (Dash Cam Video 8:02:30).  Davis then backed his vehicle up, and when he returned to the chase, his dash-camera captured Officer Tidwell, who had also pulled his police vehicle into the car-wash area, braking as Malone drove out, across the car-wash bay in front of Tidwell. (Dash Cam Video 8:02:35). Malone then lead Davis southbound into northbound traffic on Alta Mere Drive, causing Davis to have to slow down to avoid hitting other

7

cars. (Dash Cam Video 8:03:00). While Davis was slowed, Tidwell's police vehicle can be seen on the video racing alongside Davis in the southbound (proper direction) lane, and then cutting back across into the northbound lanes to take a position immediately behind Malone as Malone turned onto Arbor Avenue, a dead-end street.  Davis then also turned onto Arbor, and his dash-camera view then comes upon Tidwell's vehicle, which was stopped immediately behind  the pick-up truck containing Malone. (Dash Cam Video 8:03:11).

(ii)--Compilation DVD of Davis Dash-Cam and the Aerial View After Flight Ends

The compilation DVD then depicts Malone's forcible removal from the truck and his arrest. Malone added to the compilation DVD a timer showing a reference time ("RT"), to help coordinate identification of specific points in the two videos. This timer starts at RT 0:00, a time corresponding to the dash-cam video timer at 8:03:11, and this is the approximate moment that Malone stopped the truck--with Tidwell's vehicle immediately behind it. The Court will now detail its observations of what the compilation DVD shows:

RT 0:04: Davis's vehicle pulls to a stop. Tidwell has already exited his car and removed his police dog, unleashed, from the back seat. He runs toward the truck.

RT 0:08: Tidwell draws his gun and points it at Malone.

RT 0:11: Davis appears in the left side of the frame and pauses.

RT 0:14-15: Tidwell reels back and strikes into the cab of the truck while Davis begins to move towards the scene with his gun drawn. Fields's vehicle pulls up on the right side of the truck.

RT 0:19: Davis has approached close to and behind Tidwell. The video from the helicopter begins.

RT 0:23: Davis approaches close to Tidwell; Fields approaches from around the back of the truck.

RT 0:25: Davis and Fields are adjacent to Tidwell and the dog. Officer Gipson approaches.

RT 0:28: Malone is still in the driver's seat of the truck, while Tidwell is pointing a gun at Malone with his right hand and reaching towards Malone with his left. The dog is directly below Tidwell; Davis, Fields, and Gipson are immediately next to Tidwell.

RT 0:30: Tidwell sporadically reaches down into the cab with his left hand.

RT 0:34: Tidwell reaches back and again punches into the cab. Davis is immediately next to Tidwell. Fields and Gipson move around the rear of the truck.

RT 0:37-38: Tidwell steps back and points his gun towards the cab. Davis is immediately by the truck cab window. Fields smashes out the passenger-side window as Gipson also approaches the passenger side window.

RT 0:40: Tidwell lifts up the K-9 dog with his left hand and lunges the dog towards Malone. Davis is immediately next to the window; Fields and Gipson are next to the passenger-side window.

RT 0:42: Officers Ball and Watts come into the scene to the right and several feet behind the right rear corner of the truck.

RT 0:45: Tidwell continues to lift the dog towards Malone, who has begun to appear in the window of the truck. Davis is immediately next to Tidwell. Officer Stroud appears with his gun drawn and hurries towards Tidwell and Davis. Fields and Gipson remain next to the passenger window. Watts has moved slightly forward, but is still next to the rear right corner of the truck; Officer Lehman appears next to Ball several feet behind and to the right of the truck.

RT 0:48-50: Tidwell and the dog lunge towards Malone, who is now sitting on the edge of the driver's-side window. Davis remains immediately to Tidwell's right. Stroud circles around to Tidwell's immediate left. Watts and

Lehman have moved closer to the passenger-side window.
Fields remains next to the passenger-side window. Fields
has begun to back away from the passenger-side window.
Ball remains at his location far back from the rear of
the truck and to the right.

RT 0:53-55: Tidwell appears to grab and pull at Malone as
the dog lunges up towards him, while Malone remains
sitting on the truck window frame. Davis and Stroud
remain immediately next to Tidwell and the dog. Lehman
has moved closer to the passenger window. Fields, Gipson,
Watts and Ball retain their position.

RT 0:56: Tidwell raises his hand and brings it down in a
striking motion (view partially blocked in the dash cam
view).

RT 1:00: Tidwell now has grabbed Malone and is pulling
him out of the window as the dog continues to lunge at
Malone, and while Malone is coming out of the window
Tidwell strikes Malone with his knee. Davis and Stroud
remain immediately next to Tidwell and the dog. Fields
has moved around the front of the truck, and is now close
to the left side of Tidwell. Gipson is moving around the
rear of the truck from right to left towards the driver's
side. Lehman is now next to the passenger window. Ball
and Watts are at the right rear of the truck; Officers
Evans and Faigin begin to walk into the view of the
dashboard camera.

RT 1:03: Tidwell and the dog pull Malone out of the
window and onto the ground, where Tidwell again strikes
Malone with his lower leg. Fields is now immediately to
the left of Malone, Tidwell and the dog. Lehman has moved
around the front of the truck such that he is now also
immediately to the left of Malone, Tidwell, and the dog.
Davis, Gipson, and Stroud remain within a few feet of and
to the right of Malone, Tidwell and the dog. Ball remains
at the right rear of the truck. Watts has moved to the
left rear of the truck but is behind Davis and Gipson.
Evans, Faigin, and Officer Davidsaver, who has now
appeared, walk towards the scene but are several yards
away next to the rear of Tidwell's vehicle.

RT 1:04-13: Malone, while lying on the ground, is
repeatedly attacked by the unrestrained dog, while
Tidwell stands above them. Davis, Gipson, Stroud, Fields
and Lehman stand in a semi-circle around and within just
a few feet of Tidwell, Malone and the dog. Ball gradually
walks around the front of the truck, such that by 1:15,
he is to the left of where the dog attack is occurring

only a few yards away. Watts, Davidsaver, Faigin, and Evans form a second tier of a semi-circle of officers, but all of them are behind the other officers and several yards away, next to the back of the truck.

RT 1:14-20: Malone continues to be attacked by the unrestrained dog. Tidwell begins to lean down (apparently to handcuff Malone), while the dog continues lunging at Malone. Davis turns and walks toward Watts, and Watts then turns to walk away; all other defendants remain in place.

RT 1:20-34: Tidwell is leaning over Malone and, while the angle of aerial view of what he is doing is blocked for a few seconds, the Court infers that he is then placing the handcuffs on Malone. Davis has walked back close to the arrest location. Fields, Gipson, Stroud, and Lehman remain immediately next to where Tidwell and the dog are right over Malone on the ground. Davidsaver has taken steps closer, but remains behind other officers, along with Faigin and Evans. Ball remains at the same spot in front of the truck.

RT 1:35-40: Tidwell arises and steps away, leaving the unrestrained dog to continue lunging at an apparently cuffed Malone. Davis, Fields, Gipson, Stroud, and Lehman remain within a few feet of Malone. Ball remains in front of the truck a few yards from Malone and the dog.

RT 1:40-43: Tidwell leashes the dog, but continues to allow him to lunge at Malone. All other defendants remain in their same places.

RT 1:43-52: Tidwell continues to allow the dog to lunge at Malone, although the dog is now on a leash. All other defendants remain in their same places.

RT 1:52-2:00: Tidwell pulls the dog away from Malone and restrains him at the front of the truck. Stroud looks into the cab of the truck with his flashlight. Davis, Gipson, Fields, and Lehman remain within a few feet of where Malone now lies on the ground, untouched. Ball steps back and away from where Tidwell is restraining the dog at the front of the truck. Evans, Faigin, and Davidsaver remain behind the other officers at the left rear of the truck.

RT 2:00-15: Tidwell removes the dog via the passenger side of the truck. Stroud gradually steps over towards Malone and leans down to him. Ball walks back towards where Stroud attends to Malone. Lehman remains standing

11

next to Malone and Stroud.  The other officers begin to disburse and walk back towards the rear of the truck.

RT 2:12: Officer Fields claps his hands once.

RT:2:33-36: Officer Lehman reaches out and pats Officer Davis on his back.

RT:2:41 Aerial view terminates.

RT:4:47 Dash Cam video terminates.

(Compilation Video).

## III.  Summary Judgment Standard

When the record establishes "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law," summary judgment is appropriate.  Fed. R. Civ. P. 56(a).  "[A dispute] is 'genuine' if it is real and substantial, as opposed to merely formal, pretended, or a sham." *Bazan v. Hidalgo Cnty.*, 246 F.3d 481, 489 (5th Cir. 2001) (citation omitted).  A fact is "material" if it "might affect the outcome of the suit under governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

To demonstrate that a particular fact cannot be genuinely in dispute, a defendant movant must (a) cite to particular parts of materials in the record (e.g., affidavits, depositions), or (b) show either that (1) the plaintiff cannot produce admissible evidence to support that particular fact, or (2) if the plaintiff has cited any materials in response, show that those materials do not establish the presence of a genuine dispute as to that fact. *See* Fed. R. Civ. P. 56(c)(1). Although the Court is **required** to consider only the cited materials, it **may** consider other materials

in the record. *See* Fed. R. Civ. P. 56(c)(3). Nevertheless, Rule 56 "does not impose on the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment." *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915-16 n.7 (5th Cir. 1992). Instead, parties should "identify specific evidence in the record, and . . . articulate the 'precise manner' in which that evidence support[s] their claim." *Forsyth v. Barr*, 19 F.3d 1527, 1537 (5th Cir. 1994).

In evaluating whether summary judgment is appropriate, the Court "views the evidence in the light most favorable to the nonmovant, drawing all reasonable inferences in the nonmovant's favor." *Sanders-Burns v. City of Plano*, 594 F.3d 366, 380 (5th Cir. 2010) (citation omitted) (internal quotation marks omitted). "After the non-movant has been given the opportunity to raise a genuine factual [dispute], if no reasonable juror could find for the non-movant, summary judgment will be granted." *Byers v. Dallas Morning News, Inc.*, 209 F.3d 419, 424 (5th Cir. 2000) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

## IV.  Analysis--Qualified Immunity

Malone seeks relief in this case under 42 U.S.C. § 1983, which "creates a private right of action for redressing the violation of federal law by those acting under color of state law." *Colson v. Grohman,* 174 F.3d 498, 504 n.2 (5th Cir. 1999)(citing *Migra v. Warren City Sch. Dist. Bd. Of Educ.,* 465 U.S. 75, 82 (1984)). "Rather than creating substantive rights, § 1983 simply provides a

remedy for the rights that it designates. Thus, an underlying constitutional or statutory violation is a predicate to liability under § 1983." *Harrington v. Harris,* 118 F.3d 359, 365 (5th Cir. 1987)(citations and internal marks omitted)(quoting *Johnson v. Harris Cnty, Flood Control Dist.,* 869 F.2d 1565, 1573 (5th Cir. 1989)).

Defendants seek summary judgment on the basis that they are entitled to qualified immunity from Plaintiff's claims of a constitutional violation. "The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "The qualified immunity inquiry thus involves two prongs that must be answered affirmatively for an official to face liability: (1) whether the defendant's conduct violated a constitutional right, and (2) whether the defendant's conduct was objectively unreasonable in light of clearly established law at the time of the violation." *Terry v. Hubert*, 609 F.3d 757, 761 (5th Cir. 2010) (citing *Pearson*, 129 S. Ct. at 816); *see also Tolan v. Cotton,* 134 S.Ct. 1861, 1865 (2014). The Court may begin its inquiry with either prong. *Tolan,* 134 S. Ct. at 1866 (citing *Pearson*, 555 U.S. at 236).

"When a defendant invokes qualified immunity, the burden shifts to the plaintiff to demonstrate the inapplicability of the defense." *Club Retro, L.L.C. v. Hilton*, 568 F.3d 181, 194 (5th Cir.

14

2009) (citing *McClendon v. City of Columbia*, 305 F.3d 314, 323 (5th Cir. 2002) (en banc)). "Because qualified immunity is 'an immunity from suit rather than a mere defense to liability[,] it is effectively lost if a case is erroneously permitted to go to trial.'" *Pearson*, 555 U. S. at 231 (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)). Thus, at the summary-judgment stage, "[t]he plaintiff's evidentiary assertions—but not mere allegations—are taken as true in the court's evaluation of qualified immunity." *Terry*, 609 F.3d at 761 (citing *Manis v. Lawson*, 585 F.3d 839, 842 (5th Cir. 2009); *see also Pearson*, 555 U.S. at 231-32 ("[T]he 'driving force' behind creation of the qualified immunity doctrine was a desire to ensure that 'insubstantial claims against government officials will be resolved prior to discovery'") (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 n.2 (1987))). The Supreme Court recently reiterated the importance of drawing inferences in favor of the non-movant in qualified immunity cases. See *Tolan*, 134 S. Ct. 1861, 1866 ("[U]nder either prong of the qualified immunity analysis, courts my not resolve disputes of fact in favor of the party seeking summary judgment").

A. Fourth Amendment Excessive-Force Claim Against Tidwell

(i) The Constitutional Violation

Plaintiff Malone asserts that Tidwell's use of force against him was excessive under the circumstances. The Supreme Court has held that "all claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be

15

analyzed under the Fourth Amendment and its 'reasonableness' standard." *Graham v. Connor*, 490 U.S. 386, 395 (1989); *see also Plumhoff v. Rickard,* 134 S.Ct. 2012, 2020 (2014); *Peterson*, 588 F.3d at 845 ("[E]xcessive force implicate[s] the Fourth Amendment's proscription against unreasonable seizures"). A seizure occurs when an officer "by means of physical force or show of authority, has in some way restrained the liberty of a citizen."*Terry v. Ohio*, 392 U.S. 1, 20 n. 16 (1968). "To prevail on their excessive force claim, the plaintiffs must establish '(1) an injury (2) [that] resulted directly and only from a use of force that was clearly excessive, and (3) the excessiveness of which was clearly unreasonable.'" *Ontiveros*, 564 F.3d at 382 (quoting *Freeman v. Gore*, 483 F.3d 404, 416 (5th Cir. 2007) (internal citation omitted).

Whether Plaintiff has shown a Fourth Amendment excessive-force claim depends on whether he has shown that Tidwell's alleged use of force was objectively unreasonable under the circumstances. *Graham,* 490 U.S. at 396. Objective reasonableness is "a pure question of law" that is considered after determining the relevant facts. *Scott v. Harris*, 550 U.S. 372, 381 n. 8 (2007). To gauge the objective reasonableness of the force used, the courts "must balance the amount of force used against the need for force." *Ramirez v. Knoulton,* 542 F.3d 124, 129 (5th Cir.2008) (quoting *Flores v. City of Palestine*, 381 F.3d 391, 399 (5th Cir. 2004)). Proper application of this balancing test "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect

16

poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham,* 490 U.S. at 396. The reasonableness inquiry must consider "the fact that police officers are often forced to make split-second judgments--in circumstances that are tense, uncertain, and rapidly evolving--about the amount of force that is necessary in a particular situation." *Id.* at 397.

In the specific context of this case, the determination of the reasonableness of Tidwell's conduct must be based only on the force employed after Malone had stopped the truck and was sitting in the cab. *See generally Tolan*, 134 S. Ct. at 1866 ("In cases alleging unreasonable searches or seizures, we have instructed that courts should define the 'clearly established' right at issue on the basis of the 'specific context of the case'") (citing *Saucier v. Katz*, 533 U.S. 194, at 201 (2001)(other citation omitted). Although it is undisputed by the parties that plaintiff Malone attempted to evade arrest and led police officers on a high-speed chase, because he then brought the stolen truck to a stop at the end of a dead-end street, this is not a case where force was needed to end the pursuit, or to stop a fleeing suspect from harming others. The reasonableness of the officers' conduct after Malone ended his flight must be viewed in the context of the facts as alleged by Malone (and confirmed by the video evidence): Malone remained in the cab of the truck, without any indication of an attempt to flee. As to the effectuation of the ensuing arrest, the Court must balance the amount of force used against the amount needed. Here, the parties' versions of the facts differ substantially regarding

17

how much force was needed and how much was used during Malone's arrest. Where the evidence is conflicting, courts "assume plaintiff's version of the facts is true, then determine whether those facts suffice for a claim of excessive force under [the] circumstances." Wagner v. Bay City, Tex., 227 F.3d 316, 320 (5th Cir.2000).

The summary-judgment evidence does not establish an absence of genuine issues of material fact with respect to the reasonableness of Officer Tidwell's conduct. Tidwell was involved in the pursuit of Malone of his own volition, in violation of FWPD pursuit procedures and in violation of FWPD's particular canine-unit procedures, which require canine officers to stay away from vehicle pursuits. (PApp. at 186-87, Tidwell Depo. 170-71; Papp. at 128, FWPD Canine Unite Procedures at 4.) Tidwell had already observed Malone earlier in the pursuit, when Malone stopped briefly at the car wash, and had observed Malone's inability to get out of the truck. (Papp. 169, Tidwell Depo. at 14-15; Papp. 49, IAD File FW00302; Papp. 55, IAD File FW00371.) In this regard, Tidwell testified as follows:

> Q. The [K-9 Unit Arrest Form] report in the Details section continues (as read): the actor pulled into a car wash at 2945 Alta Mere. He brought the stolen vehicle to an abrupt stop and attempted to exit the vehicle to possibly flee on foot from the pursuing officers. Did I read that correctly?
> A. Yes
> O. Is that a true statement?
> A. That's a true statement.
> Q. And that's something you saw, isn't it?
> A. That's what I saw.
> Q. The next sentence read, (as read) . . . The actor was unable to open the driver's side door to exit. Did I read that sentence correctly?
> A. Yes

18

```
Q. And that--is that a true statement?
A. Yes.
Q. Okay. That's something you observed?
A. That's what I observed.
```

(Papp. 169, Tidwell Depo. at 14-15.)

This admission by Tidwell is evidence that he already was aware, when the pursuit later came to a stop on Arbor street, that Malone possibly could not get out of the truck.

Furthermore, prior to the end of the pursuit, Tidwell made two statements to his fellow officers over the radio: "I got a dog, so y'all can just chill out, I got a dog with ya," and "he just tried to ram K9-77, so make no contact."[4] (PApp. 1, Audio DVD at 7:20, 7:30.) At his deposition, Tidwell admitted that his statements were intended to indicate to the other officers that he intended to deploy the police dog at the conclusion of the pursuit. (Papp. 169-170, Tidwell Depo. at 15-17.) This evidence creates a fact issue on whether Tidwell had already decided to deploy the dog without knowing how the pursuit was going to terminate.

When Tidwell got out of his vehicle as the first officer to make an immediate approach towards the truck with the dog unleashed he violated Fort Worth Police Department (FWPD) general orders for a felony-stop procedure. (Papp. 41, IAD File FW00244.) As to the events that followed, the Court has already recounted what the videos show of Tidwell's making striking movements towards Malone,

---

[4]"K-9 77" is the identifier for Tidwells' police car. Although there is a dispute over whether the audio recording shows that Tidwell said "make" no contact, or "made" no contact, for purposes of resolution of these summary judgment motions, the Court assumes that Tidwell said "make" no contact. *See Stroud* Appendix at C, Audio DVD at 7:20. And, to the extent it is unclear in the record as to exactly what Tidwell said only creates a material dispute as to Tidwell's intent in making such statement on the radio.

pulling him out of the truck, striking him with his knee, lifting the dog up to lunge at him, and allowing the dog to repeatedly lunge at Malone after he was removed from the truck and on the ground. Malone testified that when he "immediately stopped" he put the truck in "park", and then never engaged any other gear, and "stuck his hands out the window." (Papp. 341, Malone Depo. at 82; PApp. 339, Malone Depo. at 75.) Malone also swore to this statement:

> After stopping on the dead-end street and putting the truck in park, I never flailed, moved erratically, reached for the shifter, or reached for anything else in the truck (other than, as I testified to in my deposition, moving my right hand to attempt to unlock the door after I told Officer Tidwell "I'm going to try to unlock the door," while my left hand was up) [and] I never pushed Officer Tidwell's hand or hands away, nor did I ever attempt to do so.

(Papp. 363, Malone January 9, 2014 Declaration.) Malone also testified that Tidwell spoke to him and events ensued as follows:

Tidwell:   [With his gun pointed at Malone] "We're going to do this before the cameras get here."

Malone:    "We're going to do what?"

Tidwell:   "Get out of the vehicle."

Malone:    "This is not my truck. I cannot open the door."

Tidwell:   "Get out of the vehicle."

Malone:    [I said again] "This is not my truck. I can't get the door open." [to show Tidwell the truck door would not open, Malone then] "pulled on the door lever from outside with [his] other hand. Both of [his] hands were still out the window." [And I said] "I'm going to try to unlock the door."

(Papp. 339-40, Malone Depo. at 75-79.) Malone testified that Tidwell hit him in the mouth with his gun, as he was trying to

unlock the door, breaking Malone's tooth. (Papp. 340-41, Malone Depo. at 80-83.)  In response, Malone stated "Look Motherfucker, I told you I can't get the door open." (Papp. 341, Malone Depo. at 83.) Tidwell then told other officers to "Break out the goddamned windows." (Papp. 343, Malone Depo. at 89.) At some point, Tidwell hit Malone again with his fist. (Papp. 345, Malone Depo. at 99.) Malone also acknowledged that he may have inadvertently hit the accelerator, but testified he did so either when he was hit with the gun [or later] exiting the vehicle. (Papp. 341, Malone Depo. at 81-82.)

Malone testified that as he was fearful Tidwell would either shoot him or drag him through broken glass, he said, "I'm coming out the window," and began to push himself out the window. (Papp. 343, (Malone Depo. at 89-90.)  Malone testified that then Tidwell lifted the dog up by the collar and the dog bit his arm. (Papp. 343, Malone Depo. at 91-92.) Malone also testified:

> I briefly sat on the edge of the window because--waiting for the dog to disengage because I was thinking about not landing on the dog because I knew if landed on the dog and hurt the dog, then I would--I would be in more trouble than I was already in.  Again this is happening in less than a second."

(Papp. 343-44, Malone Depo. at 92-94.)  Tidwell then pulled Malone out of the truck and commanded him to get on the ground face down, spread-eagle, to which Malone testified he complied to the best of his ability. (Papp. 344, 346; Malone Depo. at 95, 101.) Nevertheless, Tidwell allowed the dog to again begin biting Malone, and according to Malone, stuck his gun to Malone's head and said "Fuck with my dog and I'll kill you." (Papp. 346, Malone Depo. at

101.) Malone testified the dog continued to bite him, and that Tidwell commanded the dog to bite him more. (Papp. 346, Malone Depo. at 102-04.) Tidwell testified in deposition that he allowed the dog to keep biting Malone because he could not see Malone's hands.[5] (Papp. 175, Tidwell Depo. at 50-51.) Even after Malone was handcuffed, however, Tidwell can be seen placing the dog on a leash and then pulling on the leash. (Compilation DVD RT 1:40-50.) But that action did not signal the dog to release; instead, as Tidwell himself explained in deposition, pulling on the leash only signaled the dog to bite more. (Papp. 193, Tidwell Depo. at 198-99.)

Malone alleges he sustained several injuries. (PApp. 99-112, 116 (Photographs).) He complains he sustained a broken tooth, which he subsequently had to have removed. (Papp. 353, Malone Depo. at 313.) He also received injuries to his left bicep and tricep, neuropathy from nerve damage from the bites, a torn rotator cuff, and scars. (Papp. 352-53, Malone Depo. at 312-13.) He testified that he has received medical care for the neuropathy and the rotator cuff injuries. (Papp. 348, Malone Depo. at 109-10.)

Plaintiff has presented a sworn statement and sworn deposition testimony that once he stopped the truck, he held his hands up where Tidwell could see them, and did not attempt to flee. There is no testimony that Malone took any aggressive action towards Tidwell, but there is evidence that he was repeatedly struck by Tidwell.  And, rather than becoming aggressive in response, there

---

[5]The Court wonders how a man, who is prone on the ground and being attacked by a dog, can reasonably be expected to expose his hands and unflinchingly hold them behind his back.

is testimony that although Malone attempted to comply with Tidwell's commands, he was forcibly removed from the truck and subjected to a dog attack when he was unable to open the door and step out. Furthermore, once on the ground, there is no evidence that Malone took any aggressive action towards Tidwell or the other officers or that he attempted to flee. Instead, he avers that though he remained on the ground and offered no resistance toward Tidwell or the other officers, he was still subjected to repeated bites by the police dog. The video evidence does not contradict any of Malone's testimony.

Plaintiff has also presented evidence that because of this use of force, he had numerous cuts, a broken tooth that had to be removed, neuropathy, and a damaged rotator cuff, all of which required medical attention. The Fifth Circuit has held that it is objectively unreasonable to use similar types of force against a suspect who is not resisting. See *Ramirez v. Martinez,* 716 F.3d 369, 378–79 (5th Cir.2013) (denying qualified immunity where officer used a taser on a subdued and handcuffed suspect, even where suspect had initially pulled away from officer's attempt to handcuff him); *Newman v. Guedry*, 703 F.3d 757, 762–63 (5th Cir.2012) (denying qualified immunity where officers immediately resorted to using a nightstick and taser where suspect did not pose threat to officers' safety and did not resist officers or attempt to flee); *Bush v. Strain*, 513 F.3d 492, 501–02 (5th Cir.2008) (denying qualified immunity where officer forcefully slammed a suspect's face into a vehicle after subduing her and placing her in handcuffs).

Plaintiff Malone has presented sufficient summary judgment evidence to create a genuine dispute of material fact as to whether Tidwell used excessive force against him. Under Malone's version of the facts, a reasonable jury could find that defendant Tidwell violated his Fourth Amendment rights by using force against him that was excessive to the need and that this force was the cause of his injuries.

(ii) Clearly Established Law

To leap the second hurdle of the asserted qualified-immunity defense, Plaintiff must demonstrte that the violation of his Fourth Amendment rights was objectively unreasonable given the clearly established law at the time of the alleged constitutional violation. See *Club Retro, L.L.C. v. Hilton*, 568 F.3d 181, 194 (5th Cir. 2009). This is an "entirely separate inquiry" from the reasonableness determination inherent in considering whether the Plaintiff has made out a Fourth Amendment excessive-force claim. *Ontiveros*, 564 at 383 n. 1. For purposes of qualified immunity, "clearly established" means that the "contours of the right" are "sufficiently clear that a reasonable official would understand that what he is doing violates that right." Saucier, 533 U.S. at 202. Being clearly established in an abstract sense generally gives insufficient notice—in most cases, the law should be clear in a more particularized sense related to the specific context in which the officer is acting. *Brosseau v. Haugen*, 543 U.S. 194, 198-99, (2004); *Hope v. Pelzer*, 536 U.S. 730, 739-42 (2002)(recognizing that when the constitutional violation is obvious, a materially similar case is unnecessary to find the law clearly established);

24

*Kinney v. Weaver*, 367 F.3d 337, 350 (5th Cir.2004)(en banc). Because the primary concern is fair notice to the officer, the law can be clearly established in some cases "despite notable factual distinctions between the precedents relied on and the cases then before the Court, so long as the prior decisions gave reasonable warning that the conduct then at issue violated constitutional rights." *Hope*, 536 U.S. at 740 (citation omitted).

At the time of Plaintiff's July 2009 arrest, it was clearly established that the permissible amount of force necessary to arrest a suspect depends, in part, on whether the suspect was resisting arrest or attempting to flee. *Graham*, 490 U.S. at 396. Under Plaintiff's version of events, he was sitting in the cab of the truck, with his hands in sight, and not resisting arrest or attempting to flee when Officer Tidwell approached him. In seeking summary judgment, none of the defendants directly engages Malone's version of the facts, including his contention that he gave no resistance once he stopped the truck. In this, the defendants parallel the approach of the defendants in *Ling v. Banda*, 262 F. App'x. 675, 678 (5th Cir. 2008), who sought summary judgment on very analogous facts of officers' use of excessive force after the termination of a seven-minute high-speed pursuit, in which the suspect had pulled over his motorcycle and raised his hands to surrender. *Id*. at 678.[6]

---

[6] The Fifth Circuit recited the facts in *Ling* as follows:
"On the night of September 6, 2003, Glen L. Shaw, an officer with the Garland Police Department, observed Randall Ling speeding on his motorcycle and signaled for him to pull over. Ling instead led Shaw on a seven-minute high-speed pursuit. Officers Mott and Banda were dispatched to assist and joined the pursuit.
    Eventually, Ling ended the chase by pulling over to the side of the road

The defendants in *Ling* failed to "concede the best view of the facts to the plaintiff," but instead "assert[ed] that their conduct was objectively reasonable under their version of the facts." *Id.*, at 679.  They did not acknowledge that plaintiff's contention that he was "helpless and not resisting arrest, nor d[id] they concede that the alleged force used by them against Ling consisted of kicks and punches to the lower portion of Ling's body." *Id.*  Rather, their claims for qualified immunity relied on their contrary assertions that Ling "was refusing to surrender his hands" and the force they used against Ling was "little more than kneeing a suspect in the back to get him to the ground to effect arrest." *Id.* Thus, as the arguments on appeal amounted to challenges to the district court's determination that material fact issues existed, rather than an appeal of the purely legal question of whether a given course of conduct would be objectively reasonable in light of clearly established law, the court of appeals dismissed the appeal. Before dismissal, however, the court of appeals observed that on

---

and turning off his motorcycle. Despite the fact that Ling thereupon raised his hands to surrender, Shaw tackled Ling to the ground and physically attacked him. Shaw allegedly grabbed Ling's helmet and struck Ling repeatedly in the face through the opening on the front of the helmet. One of the blows caused a wound above Ling's left eye that eventually sent Ling to the hospital and required six stitches.

Shortly after Shaw tackled Ling, Banda and Mott arrived on the scene to assist Shaw. When Banda arrived, he sat on Ling's lower back while Ling was face down. Banda yelled several times for Ling to give him his hands. Ling asserts that he did not resist arrest in any way during this time period and was simply laying helpless on his stomach with his hands trapped beneath him. According to Ling, he did not know that Banda and Mott were trying to get his hands until "the very, very, very end," and that he stated "I can't. I can't" in response to Banda's requests for his hands. Despite his submission, Ling alleges that he felt other areas of his body being punched and kicked while Shaw was assaulting his head and upper body. According to Ling, although he did not see Banda or Mott physically strike him, given "the relative positions of Shaw, Ling, Banda and Mott, only Mott or Banda could have administered these blows." After approximately thirty seconds, the officers handcuffed Ling and placed him under arrest. *Ling,* 262 F. App'x at 678 (internal footnote omitted).

the plaintiff's version of the facts, defendants' claims for qualified immunity properly failed due to the lack of any reasonable perceived threat:

> If Ling was in fact helpless and obviously not resisting arrest--as Ling asserts--Ling could not have constituted any real or perceived threat that would have justified Banda's and Mott's alleged kicks and punches to Ling's lower body or their failure to intervene and stop Shaw's attack. **This is clearly true even though Ling failed to produce his hands from underneath him in response to Banda's repeated orders.**

*Id.* at 679 (emphasis added). The Court then concluded that summary judgment was properly denied: "Thus, [the defendants'] arguments that their actions were objectively reasonable depend on the version of the facts the jury ultimately believes. Accordingly, as the district court found, there is a material fact issue, which precludes our jurisdiction." *Id.* at 680.

Defendant Tidwell's claim that he could not see Malone's hands in the truck or on the ground, is not only disputed by Malone, but, even if true, is unavailing to Defendants. On Malone's version of the facts, he was--like the plaintiff in *Ling*-- "helpless and not obviously resisting arrest," and thus Tidwell could not reasonably have perceived a threat justifying the force he used against Malone. *See Id.; accord Collins v. Bauer*, No.3:11-CV-0887-B (BH), 2012 WL 443010, at (N.D. Tex. Jan 23, 2012), *rep. and rec. adopted*, 2012 WL 444014 (Feb. 10, 2012)(Boyle, J.)(potential liability for excessive force and bystander nonfeasance where the plaintiff surrendered after being knocked off his motorcycle in a vehicle pursuit but officers beat him).

In another case in this district involving a beating and dog

attack following a vehicle pursuit, *Calton v. City of Garland,* No. 3:02-CV-2215-(N), 2004 WL 2965005, at *2-4 (N.D. Texas. Dec. 10, 2004) (Godbey, J.), the court found that even where there was a vehicle pursuit "at a high rate of speed" and claims by officers that the plaintiff was unresponsive to commands, summary judgment for the handler and bystanders was not supported:

> Calton has pointed to specific facts in opposing the motion for summary judgment that, if true, would establish a constitutional violation. Calton accuses Officer Shupe of striking him in the head with a metal object, repeatedly slamming his head into the hood of a police cruiser, and painfully grabbing his testicles all while Calton was restrained in handcuffs. Calton also claims that Officer Puckett was present during the attacks and could have stopped them, creating liability for Officer Puckett's alleged failure to intervene when in a position to halt an ongoing constitutional violation. *See, e.g., Harris v. Chanclor*, 537 F.2d 203, 206 (5th Cir.1976). While Calton's hallucinations may be a likely explanation for his belief that these officers committed these acts, or even that these acts occurred at all, the Court cannot resolve such fact questions on summary judgment. *See Johnston v. City of Houston*, 14 F.3d 1056, 1058-60 (5th Cir.1994) (stating that summary judgment establishing qualified immunity is inappropriate where sharply contrasting versions of the facts exist unless the Calton's version fails to implicate clearly established law). Accordingly, Officers Puckett and Shupe are not entitled to summary judgment.

Defendants argue in the alternative that any force they did use, including the release of the police dog under these circumstances, was objectively reasonable, entitling them to summary judgment. The officers' conduct in this case is to be measured against the Fourth Amendment's "objectively reasonable" standard. *Graham v. Connor*, 490 U.S. 386, 394, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). Although no precise equation exists to calculate objective reasonableness, Graham provides the Court with factors to consider: (1) the "severity of the crime at issue," (2) "whether the suspect poses an immediate threat to the safety of the officers or others, and" (3) "whether he is actively resisting arrest or attempting to evade arrest by flight." Id. at 396 (citing *Tennessee v. Garner*, 471 U.S. 1, 8-9, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985)).

Defendants argue that the facts in this case compel the

28

conclusion that the officers' actions were objectively reasonable. Defendants point out that Calton had just committed the very severe crime of attempted murder. However, the officers were aware only that Calton had committed a misdemeanor traffic offense. Defendants also claim that Calton was an immediate threat because he reached into his car as if for a weapon. Calton claims that he made no such movement. Defendants claim that Calton was actively resisting because he failed to heed their oral commands to walk backwards toward them. Calton claims he was walking backwards in compliance with their commands when the dog attacked. Defendants claim that they used only reasonable force to physically take Calton into custody. Once on the shore and restrained in handcuffs, Calton claims the Defendants beat him with their fists and a metal object. Calton also claims the Defendants grabbed his testicles and poked him in the eyes. In the summary judgment context, the Court may not resolve these disputed issues of fact. Indeed, the Court must view the facts in the light most favorable to Calton, the nonmovant. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Viewing the facts in the light most favorable to Calton, the officer's release of a police dog on a suspect of a misdemeanor traffic offense who is making no threatening actions and is not actively resisting at the time of the release was objectively unreasonable. In addition, severely beating a handcuffed suspect who is not resisting was also objectively unreasonable.

*Calton*, 2004 WL 2965005, at *2-3. The *Calton* decision supports Malone's argument that the facts, viewed in the light most favorable to Malone, cannot support summary judgment based on qualified immunity.  The decision also negates any contention by Tidwell that the fact that Malone was earlier involved in leading a pursuit at high speeds and engaging in reckless driving somehow elevated the reasonableness of the force used to arrest Malone.

Moreover, Tidwell's undisputed failure to warn Malone before releasing the dog and before lifting the dog up to where it could bite Malone also precludes summary judgment for Tidwell on the basis of qualified immunity. *See e.g. Stanjac,* No. 10-829, 2012 WL

3862377, at *11 (M.D. La. 2012)("[N]o reasonable police officer could conclude that the use of a police dog is permissible when employed, without warning, against a secured non-threatening suspect"); *Vathekan v. Prince George's County,* 154 F.3d 173, 179 (4th Cir. 1998) ("[F]ailure to give a warning before releasing a police dog is objectively unreasonable in an excessive force context").

In sum, Plaintiff has provided competent summary judgment evidence sufficient to create a genuine dispute of material fact regarding whether the force employed by Tidwell on July 23, 2009, was excessive to the need.  Malone's version of the facts, which the Court must take as true for purposes of this motion, suffices to support a finding that defendant Tidwell violated his constitutional rights by using excessive force against him and that the violation was objectively unreasonable under clearly established law at the time of the violation.  The disputed, material facts regarding the use of force preclude "the Court from granting summary judgment on the ground of qualified immunity." *Estate of Hens on v. Wichita Cnty., Tex.*, 652 F.Supp.2d 730, 748 (N.D.Tex.2009). Defendant Tidwell's motion for summary judgment will therefore be denied.


B. Bystander Liability Claims against other Defendants

Malone's claim against the bulk of the defendants is not that they directly used force, but that they are liable for failing to intervene to attempt to stop the actions of Officer Tidwell. Again,

resolution of the bystander defendants' qualified immunity defense involves the two prongs of (1) whether a particular defendant's conduct violated a constitutional right, and (2) whether a defendant's conduct was objectively unreasonable in light of clearly established law at the time of the violation." *Terry,* 609 F.3d at 761; *see also Tolan,* 134 S.Ct. at 1865.

(i) Constitutional Violation

The Fifth Circuit, in *Hale v. Townley*, 45 F.3d 914, 919 (5 Cir. 1995), first recognized the doctrine of "bystander liability" in the excessive-force context. It held that "an officer who is present at the scene and does not take reasonable measures to protect a suspect from another officer's use of excessive force may be liable under section 1983." *Hale*, 45 F.3d at 919 (citations omitted). "The concept of bystander liability is premised on a law officer's duty to uphold the law and protect the public from illegal acts, regardless of who commits them." *Randall v. Prince George's County*, 302 F.3d 188, 203 (4th Cir.2002). "[I]n certain limited situations, bystanding officers are obliged to act." *Id*. at 204. Therefore, "it is clear that one who is given the badge of authority of a police officer may not ignore the duty imposed by his office and fail to stop other officers who summarily punish a third person in his presence or otherwise within his knowledge." *Id*. (quoting Byrd v. Briske, 466 F.2d 6, 11 (7th Cir.1972)).

In *Whitley v, Hanna*, 726 F.3d 631, 646 (5th Cir. 2013), *cert. denid,* 134 S.Ct. 1935 (2014) the Fifth Circuit held that *Hale* is consistent with other circuits' determination that an officer may

31

be liable under § 1983 under a theory of bystander liability where the officer "(1) knows that a fellow officer is violating an individual's constitutional rights; (2) has a reasonable opportunity to prevent the harm; and (3) chooses not to act." *Whitley,* 725 F.3d at 646 (citations omitted).  More recently, the Fifth Circuit again listed these elements in remanding a bystander-liability claim arising from excessive force, even though the plaintiff was unable to identify the specific individual responsible for the underlying use of force. *Kitchen v. Dallas County, Texas*, No. 13-10545, 2014 WL 3537022, at *6-7 (5th Cir. July 17, 2014.) The focus of the bystander-liability inquiry is upon whether the bystander officer has "a reasonable opportunity to realize the excessive nature of the force and to intervene to stop it." *Hale,* 45 F.3d at 919. In resolving whether a plaintiff has sufficiently alleged a bystander-liability claim, a court must also "consider whether an officer 'acquiesce[d] in' the alleged constitutional violation." *Whitley,* 726 F.3d at 647 (citing Hale, 45 F.3d at 919; *Baker v. Monroe Twp*., 50 F.3d 1186, 1193-94 (3d Cir.1995) (premising liability on senior officer's knowledge of, and acquiescence in, treatment of victim); and *Peavy v. Dall. Indep. Sch. Dist.*, 57 F.Supp. 2d 382, 390 n. 4 (N.D.Tex.1999) (*Hale* inapplicable where defendant did not acquiesce in any conduct violating plaintiff's constitutional rights)). Mere presence at the scene of alleged use of excessive force, however, does not give rise to bystander liability. *See Whitley,* 726 F.3d at 646-47; *Vasquez v. Chacon,* No.3:08-CV-2046-M, 2009 WL 2169017, at *6 (N.D.Tex. July 20, 2009)(citing *Nowell v. Acadian Ambulance Serv.,*

32

147 F.Supp. 2d 495, 507 (W.D.La. 2001), *aff'd* 2010 WL 3023273 (5th Cir. July 23, 2010)). The officer must have a "reasonable opportunity to realize the excessive nature of the force and a realistic opportunity to stop it in order for the duty to intervene to arise." *Vasquez,* 2009 WL 2169017, at *6 (citing *Hale,* 45 F.3d at 919; *Nowell,* 147 F.Supp. 2d at 507). Making that determination involves consideration of both the duration of the alleged use of force and the location of the suspect relative to the allegedly bystanding officers. *See generally Vasquez,* 2009 WL 2169017, at *6.

The Court has before it Malone's bystander-liability claims against ten Fort Worth police officers.[7] Employing these standards in the review of the summary-judgment evidence, and especially the video evidence, reveals that material facts are in dispute about the proximity and the duration of the proximity of some of the officers during the arrest. But, several can show that the summary judgment evidence establishes an absence of genuine issues of material fact with respect to whether they had a reasonable opportunity to realize the excessive nature of the force and intervene.

As discussed above, the relevant use-of-force events began at the time Tidwell approached Malone with his unleashed dog. Officers Davis, Fields, Gipson, and Stroud were involved in the immediate events at the cab of the truck within 30 seconds of their commencement. Davis watched as Tidwell first struck at Malone, and he and these other three officers remained close to Tidwell, the

---

[7]One officer mentioned in earlier orders was already dismissed by stipulation.

dog, Malone, and what was happening within and around the cab of the truck from that time forward. Also, although Officer Lehman initially moved to a position to the right of Tidwell's car, and several yards behind the Malone-in-cab events, Lehman moved closer to the passenger side door before Malone was forcibly removed from the cab, and was also right by the passenger-side window as Tidwell struck Malone and lifted the dog to bite him. Immediately after Tidwell forcibly removed Malone from the truck, Lehman moved around the front of the truck and positioned himself next to where the dog then continued to attack, and remained within a few feet of Malone, the dog, and Tidwell from that point forward. Thus, as to all of these officers, the Court concludes that there are material fact issues in dispute that would, if found in Malone's favor, support his claim of bystander liability against them. The Court will turn later to the second prong on the qualified-immunity analysis as to these bystander defendants.

With regard to defendant Officers Watts, Evans, Faigin, Davidsaver, and Ball, the Court can determine from the review of the video evidence that there is an absence of any genuine disputes of material fact as to their having a reasonable opportunity to intervene to prevent harm to Malone.

- *Watts*

Officer Watts first appears at the scene about RT 0:42, after the initial actions taken by Tidwell towards Malone in the presence of several of the other officers. Watts initially stands at a position at the right rear of the pick-up truck, a few yards back and to the right of where Tidwell is next to the cab of the truck.

Although after a few seconds Watts moves a bit closer to the truck, he remains at the rear and never approaches the cab. Once Malone is removed from the truck and is on the ground, Watts remains a few yards away, behind the other officers. And, at approximately RT:1:14, Watts turns and begins to walk away. Thus, throughout his time at the scene, Watts is too far removed from the take-down to be reasonably expected to intervene; and once Malone was on the ground, he was even further away--in the second row of officers, behind those immediately next to the action.

   - *Evans, Faigin, and Davidsaver*

   In the compilation DVD, Officers Evans and Faigin do not appear at the scene until over a minute after Tidwell first approaches Malone. They first take positions next to the rear of Tidwell's car, and thus several yards away from the removal and take-down. Officer Davidsaver then appears next to Evans and Faigin and, although they collectively take a few steps towards the arrest events, all three of them then stop next to Tidwell's vehicle. After Malone is taken out of the truck and to the ground, and while the dog is attacking, these three officers stand in a semi-circle line several yards away and behind the other officers who arrived at the scene earlier.

   Even accepting Malone's account as true, which is corroborated by the video, the Court, for summary judgment purposes, finds that Evans, Faigin, and Davidsaver were not present to observe the bulk of Tidwell's treatment of Malone, were never within a few feet of Tidwell and Malone, and were behind a group of officers more able to intervene than they. Thus, there is no legal basis to hold any

of them liable as bystanders to a use of excessive force. There is no credible evidence that they acquiesced in Tidwell's actions or had an ability to intervene. These defendants are, then, entitled to summary judgment.

*-Ball*

Officer Ball, like Watts, initially came into the scene at the right rear of the truck about RT:0:40, and remained at a location several yards back from the events at the cab. Once Malone was removed from the truck and on the ground, however, at approximately RT: 1:15 into the event, Ball moved around the right side of the truck, and then to the front. Thus, Ball moved much closer to where Malone was on the ground, but still stopped a few yards away. Ball held that position at the front of the truck throughout the remaining time, until he had to step back when Tidwell pulled the dog off of Malone back towards his position. Although Ball had moved closer to where Malone was still being attacked, he was never as close to Tidwell and the dog as the officers who had been at the scene from inception. Ball was not present at the initiation of the use-of-force, and then remained several yards away from the events of Malone's forced removal from the cab.  It was only afer Malone was on the ground that Ball began to move closer to Tidwell, Malone and the dog.  Thus, there are no genuine issues of material fact as to Officer Ball's potential bystander liability, because he was not involved for a long enough time and was not close to the events throughout the approximately two minutes force was employed to have known of a constitutional violation and had a reasonable opportunity to prevent harm.

Thus, the Court concludes that there are no genuine disputes of material fact as to whether Plaintiff has shown a violation of his constitutional rights by Officers Watts, Evans, Faigin, Davidsaver, and Ball, these defendants are entitled to summary judgment on the basis of qualified immunity.

(ii) Clearly Established Law as to Bystander Liability

As noted above, for a right to be clearly established, the "contours of the right must be sufficiently clear that a reasonable officer would understand that what he is doing violates that right." *Saucier,* 533 U.S. at 202. The Fifth Circuit has held that "pre-existing law must dictate, that is, truly compel (not just suggest or allow or raise a question about), the conclusion for every like-situated, reasonable government officials that what defendant is doing violates federal law *in the circumstances.*" *Pasco v. Knoblauch*, 566 F.3d 572, 579-80 (5th Cir. 2009)(internal quotations omitted); *see also Saucier*, 533 U.S. at 202 ("The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.") Thus, the appropriate inquiry here is whether, under the law in effect at the time of the arrest, a bystander officer could have reasonably believed that he would not be violating Malone's constitutional rights if he failed to intervene to prevent Tidwell and his dog's alleged use of excessive force.

The clearly established law at the time of the events made the basis of this case in July 2009 was that an officer who is present

at the scene and does not take reasonable measures to protect a suspect from another officer's use of excessive force may be liable under section 1983. *See Hale*, 45 F.3d at 919. It was also established that mere presence is not enough, and that an officer must have a reasonable opportunity to realize the excessive nature of the force and a realistic opportunity to stop it for the duty to intervene to arise. *See Id.* And, as noted above, these officers were on notice that courts consider both the duration of the alleged use of excessive force by other officers, and the location of the suspect relative to the bystander officers. *See Vasquez*, 2009 WL 2169017, at *6 (N.D. Tex. 2009)(citing *Morris v. Pierce*, No. 07-CV-080, 2008 WL 4287967, at *7 (W.D.La. Sep. 17, 2008)(no bystander liability because no summary-judgment evidence to suggest that officer had a reasonable opportunity to intervene in a struggle that lasted 10-15 seconds); *Gilbert v. French*, No. H-06-3986, 2008 WL 394222, at *27 (S.D.Tex. Feb. 12, 2008) (officers had no time to prevent use of excessive force that occurred over the span of a few seconds); *Haggerty v. Texas Southern Univ.*, No. H-01-2990, 2005 WL 2030866, at *4 (S.D.Tex. Aug. 22, 2005) (no bystander liability where officer was several yards away and did not use any force on suspect); *Paternostro v. Crescent City Connection Police*, No.00-2740, 2002 WL 34476319, at *11 (E.D.La. Apr. 2, 2002)(summary judgment evidence did not show that officer was close enough to have had a realistic opportunity to prevent the violations of another officer).

With regard to the proper use and deployment of a police dog, another district court in this circuit observed that even though

there is not an abundance of case law addressing the use of police dogs to effectuate seizures, that does not mean there was no clearly established law that would indicate to a bystander officer that the immediate deployment of an unleashed dog (under circumstances and in a manner similar to those in this case) was unreasonable. *See Stranjac v. Jenkins, et al.*, NO.10-829, 2012 WL 3862377, at *11, n.52 (M.D. La. Sep. 5, 2012) (citing *Campbell v. City of Springboro, Ohio*, 788 F.Supp. 2d 637, 675 (S.D. Ohio 2011). The court, in *Stranjac* noted, even in the "absence of Fifth Circuit case law specifically addressing excessive force allegations in a dog bite case, no reasonable police officer could conclude that the use of a police dog is permissible when employed, without warning, against a secured non-threatening suspect. *Stranjac*, 2012 WL 3862377, at *11 (citing *Calton*, 2004 WL 2965005, at *4 (for the proposition that no reasonable officer could conclude that releasing a police dog without warning on a compliant suspect would be constitutionally permissible).[8]

      - *Officers Davis, Fields, Gipson, Stroud, and Lehman*

As noted above, Malone also swore to this statement:

After stopping on the dead-end street and putting the

---

[8]The court in *Stranjac* included the following footnote to define what it labeled as a "continuum of permissible verus impermissible use when it comes to police dogs: On the permissible end of that spectrum are cases wherein officers deploy properly trained police dogs to locate individuals who were believed to be involved in nefarious criminal activity, who may have been armed and dangerous, and who failed to surrender or respond in any manner after officers gave several warnings. *See Robinette v. Barnes*, 854 F.2d 909, 909 (6th Cir. 1988); *Matthews v. Jones*, 35 F.3d 1046, 1052 (6th Cir. 1994). On the other end of that spectrum lies a case in which a canine officer allowed a little-trained police dog to get close enough to a subject of a [pursuit] to bite the subject despite the fact that the subject had already been subdued and placed in handcuffs. *See White v. Harmon*, No. 94-1456, 1995 WL 518865, at *1, *3 (6th Cir. Aug. 31, 1995)." *Stranjac*, 2012 WL 3862377, at *11 n. 52.

truck in park, I never flailed, moved erratically, reached for the shifter, or reached for anything else in the truck (other than, as I testified to in my deposition, moving my right hand to attempt to unlock the door after I told Officer Tidwell "I'm going to try to unlock the door," while my left hand was up) [and] I never pushed Officer Tidwell's hand or hands away, nor did I ever attempt to do so.

(PApp. 363, Malone January 9, 2014 Declaration.) Thus, taking Malone's statement as true also impacts the disposition of the bystander's claims, and upon their awareness of whether Tidwell's actions were unreasonable and excessive.

Again, review of the video evidence is critical to the Court's resolution of the claim as to whether these officers were aware of the excessive force, and were close enough for long enough to have had a realistic opportunity to intervene. Officer Davis was first at the scene after Tidwell. He can be seen looking at Tidwell and the unleashed dog just a few seconds after Tidwell approached the truck. Officer Fields also approached just a few seconds later, and then Officer Gipson. All three of these defendants approached the area immediately next to Tidwell amidst the early arrest events. After a few seconds, Fields and Gipson moved around to the passenger-side window of the truck, which Fields then broke out. Even while on that side of the truck, Fields and Gipson remained immediately next to the passenger window, in clear sight of Tidwell's actions toward Malone, and certainly within shouting distance of him. Officer Stroud arrived and rushed to the area next to Tidwell and Davis, while Tidwell can be seen lifting the dog up just below the driver's side window. From this moment forward, Davis and Stroud remained within a few feet of the blows and bites that Tidwell and the dog inflicted upon Malone, except that Davis

for a few seconds turned and walked toward Officer Watts before returning to his position near Malone, who was by then on the ground. After Tidwell pulled Malone from the truck, Gipson moved away from the passenger side and came around the rear of the truck to resume a position within a few feet of Malone on the ground. Fields also moved around the front of the truck once Malone was removed and resumed a position within a few feet of Malone on the ground. Then, within a few seconds of Malone's removal to the ground, and while the dog was still biting Malone, Davis, Fields, Gipson and Stroud formed a semi-circle around Tidwell, Malone, and the dog.  These officers then just stood and watched the ensuing dog bites within a few feet of them.

Although Officer Lehman arrived approximately 45 seconds into these events, he quickly moved next to the passenger window before Malone was pulled out of the cab. He then moved quickly around the front of the truck to assume a position within a few feet of the takedown. Lehman stood next to the other four officers, and took a place at the far end of the semi-circle of officers who then stood closely by and watched as the dog was allowed to continue to bite at Malone.

Viewing this evidence in a light most favorable to Plaintiff, all of these remaining bystander defendants had close proximity to the actions of Tidwell and the dog. There are genuine disputes of material fact as to their liability as bystanders. A jury could reasonably determine that each of these defendants knew that Tidwell was violating Malone's rights and that though they had a

reasonable opportunity to stop it, they did not even try.[9]

The bystander defendants each heavily rely on *Ballard v. Hedwig Vill. Police Dep't.*, Civ. Action H-08-0567, 2009 WL 2900737 (S.D. Tex. 2009) as an example case to support an argument that the law was not clearly established as to the obligation to intervene in the circumstances presented. In *Ballard*, a prisoner filed a civil-rights complaint alleging that his constitutional rights were violated after a police canine handler ordered his dog to attack the plaintiff. *See Id.* at 1-8. The plaintiff prisoner, proceeding pro se, filed a handwritten pleading that only vaguely listed a bystander claim. *See Id* at *6. There was no videotape of the incident before the court, and the plaintiff failed to produce any evidence aside from his own testimony or to counter the canine handler's averment that none of the bystanders "ordered nor suggested to me that the canine assault Mr. Ballard." *Ballard*, 2009 WL 2900737 at *34 n.8. The bystander defendants argue that "If in 2009, a United States District Court understood the law . . . under the facts of *Ballard,* then the pre-existing law certainly was not clearly established." (Stroud Group Brief at 43.)

In the instant case, however, Malone's detailed fourth amended complaint and his deposition testimony provide significantly more

---

[9]Malone's brief includes the accusation that the bystanding officers were "laughing, cheering, clapping, high-fiving, and back-slapping." Malone's Amended brief at 22, n. 123. The only cited evidentiary support for this argument, however, is a reference to Malone's deposition where he claims he heard laughing. (PApp. 346, Malone Depo. at 102.)  Malone does not otherwise state who was laughing or at what point. Otherwise, the Court's independent review of the compilation video does not support this broad accusation.  Although Fields can be seen putting his hands together one time at RT 2:12, that does not amount to "clapping." Also, although Lehman can be seen patting Davis on his back at RT 2:33-36, there is no other such conduct witnessed. Nevertheless, the Court has concluded that genuine fact disputes remain as to bystander liability on the part of these five defendants even without crediting the claims noted here.

details than were available to the Court in *Ballard*. And, some of that evidence included that Tidwell had conveyed to the other officers in advance that they were to defer to him and "chill" and "make no contact," because he had a dog with him. Moreover, in this case there is considerable evidence of the bystander officers' witnessing objectively unreasonable conduct by Officer Tidwell other than only the deployment of the dog. And the evidence in this case includes the objective video recording of the events, their exact duration, and the immediate presence of the defendant bystander officers, all for over a minute--and most for over a minute and a half--after Tidwell's initial use of force and deployment of the unleashed dog. The *Ballard* district court opinion thus, does not control this Court's review of what was clearly established law at the time of the events in this case.[10]

Defendants also cite three district-court cases within the Fifth Circuit to support the proposition that the bystander officers did not have an opportunity to intervene, but all these cases are distinguishable. In *Nazerzadeh v. Harris Cnty,* H-08-0499, 2010 WL 3817149, at *33 (S.D. Tex. Sep. 27, 2010), the court declined to analyze the bystander-liability claim because the plaintiff failed to produce evidence sufficient to raise a fact issue as to the underlying use of excessive force, unlike  in this

---

[10]Although the Fifth Circuit affirmed the district court in *Ballard* with an observation that Ballard had "failed to point to any evidence that these officers had a reasonable opportunity to prevent or stop the attack," such statement was *dicta* because *Ballard* had already gone to a jury trial on his direct excessive force claim against the dog-handler officer and lost. *Ballard,* 408 F. App'x 844, 845 (5th Cir. 2011) (per curiam). Thus, as noted by Plaintiff, once Ballard had a jury determination against him on the underlying direct use of force, the bystander claim was moot by the time the court of appeals issued such opinion.

case. In *Zepeda v. Sizemore*, No. SA:11-CV-901-DAE, 2013 WL 4677964, at *22 (W.D. Tex. Aug. 30, 2013), the court rejected the bystander-liability claim because the video evidence rebutted the contention that the bystander officer stood idly by while a fellow officer used excessive force. *See Id.* at *22. In contrast, here the objective video evidence does show a period when these bystander officers stood immediately next to where a dog was continuing to bite at Malone. And in *Byers v. Navarro Cnty.*, No. 3:09-CV-1792-D, 2012 WL 677203, at *9 (N.D. Tex. March 1, 2012), the bystander had only 10 to 15 seconds to attempt to respond to the alleged excessive force. As discussed above, each of the five bystander defendants discussed in this section was close enough to Tidwell's use of force and employment of the dog for a much greater time.

The Court concludes that because material fact disputes remain on Malone's bystander-liability claims against defendants Davis, Fields, Gipson, Stroud, and Lehman, they are not entitled to summary judgment on the basis of qualified immunity, and that their motions must be denied.

C. Fourth Amendment Excessive Force Claim-Officer Stroud

(i) No Constitutional Violation

After Malone was handcuffed, the officers called for a Med Star ambulance, and the medics treated him. Malone has accused Officer Stroud (or someone else) of making various statements after he was handcuffed. He alleges the comments included: "Quit crying, you sound like a little girl, Mr. Tough Guy with the tattoo on his leg"; "I've waited my whole career to see a dog pull someone out of a pick-up truck window"; "I bet you'll be having nightmares about

this for awhile"; and "Leave them on behind him, and throw him face down on the stretcher." (Pl. Fourth Amended Complaint (4AC) at 48.) As Plaintiff admits in his pleadings, including his Rule 7(a) Reply, he does not know for sure who made the statements. (Rule 7(a)Reply at 6-7.) Stroud, in fact, now denies making any of these statements. (Stroud App. at 356-68; 519-22.) Malone has claimed throughout the litigation that Stroud made some of the statements while Stroud was riding in the back of the ambulance with him on the way to the hospital. Not only did Stroud mot make the statements, he never rode in the ambulance, and Plaintiff now admits this. (Stroud App. at 519, 112-13.)

Plaintiff claims that Stroud told medics to leave Plaintiff's handcuffs on behind his back and to throw him face down onto a stretcher.  The record now shows that Stroud did not make any such comments. (Stroud App. at 519-20.) Plaintiff does not claim any injury herein from being "thrown." (Stroud App. at 118.) Plaintiff does claim that being positioned on the stretcher in a face-down position with his hands cuffed behind his back "made the ambulance ride to the hospital excruciatingly painful for Plaintiff." (4AC at 49.) The Court relied upon this allegation when it denied Stroud's motion to dismiss this claim under Federal Rule of Civil Procedure Rule 12(b)(6). Plaintiff now admits, however, that he was not forced to ride to the hospital in a face-down position. When asked during the deposition if he would have preferred to be on his stomach or on his back, Plaintiff answered that he would have preferred to be on his right side, which he says is the position he ended up in on the ride to the hospital. (Stroud  App. at 141.)

When pressed further about the matter, Plaintiff admitted that a photograph taken of him at the scene before leaving for the hospital shows him positioned on the gurney on his side or back, but definitely not on his stomach--"Unless the camera was underneath me taking a picture"--Plaintiff made sure to clarify. (Stroud App. at 141.) Furthermore, with regard to the claim made against Stroud for the alleged handcuffing of Malone, it is now undisputed that Stroud did not apply the handcuffs. (C2 Video, Stroud App. at 124-25.)

Because Stroud only touched Malone to briefly search him after Tidwell had handcuffed him, Stroud simply could not have used excessive force against him. Stroud did not handcuff Malone so if he is complaining about the manner in which he was handcuffed, Stroud is not liable. If Plaintiff is complaining that Stroud or anyone else failed to consent to his unexpressed wish to be handcuffed in front of his body instead of the rear and that thereby the medical personnel were prevented from adequately tending to him--that claim has already been dismissed.

Stroud had no possible way of knowing that Malone may have had the rotator cuff or other internal shoulder injuries he now alleges, and there is no evidence that Stroud should have thought the injuries from the dog bites would have hurt Malone any less if his hands were cuffed in front of him. Moreover, Stroud simply had no obligation to change the way Tidwell had handcuffed him. Even if Malone had alleged (and he has not) that he told Stroud of some additional, non-apparent injuries, Stroud still would have had no clearly established duty to reposition the handcuffs. As one court

noted:

> [A] police officer need not credit everything a suspect tells him. *See Marx v. Gumbiner*, 905 F.2d 1503, 1507 n.6 (11th Cir. 1990). This idea is especially true when the officer is in the process of handcuffing a suspect. As another federal court recently noted, statements by suspects claiming (at the time of their arrest) to have pre-existing injuries are, "no doubt, uttered by many suspects who, if given the choice, would prefer not to be handcuffed at all and, if they must be restrained in that manner, would prefer that the handcuffs be in front."

*Rodriguez v. Farrell,* 294 F.3d 1276, 1278 (11th Cir. 2002) (internal citation omitted).

Again, there is nothing in the record indicating that Stroud had notice or knowledge of any internal shoulder injury, and there is not even an allegation that the positioning of the handcuffs affected the dog-bite wounds one way or the other. The evidence also is clear that Malone was likely never positioned on his stomach, and he certainly was free to move into any position he desired. The law on July 23, 2009, was not clearly established that Officer Stroud violated any right of Malone's rights by not repositioning the handcuffs or uttering the alleged off-hand comments regarding positioning him on the stretcher.

Thus, Stroud is entitled to summary judgment on Malone's claim that he directly subjected Malone to excessive force in violation of the Fourth Amendment.

**V. CONCLUSIONS**

Tidwell's motion for summary judgment (doc. 192) is DENIED.

47

The motion for summary judgment of defendants Stroud, Ball, Watts, and Lehman (doc. 188), is GRANTED as to Ball and Watts, and GRANTED as to Malone's direct Fourth Amendment claim against Stroud; but is DENIED as to the remaining bystander-liability claims against Stroud and Lehman.

The motion for summary judgment of defendants Davis, Fields, and Gipson (doc. 194) is DENIED.

The motion for summary judgment of defendants Evans and Faigan (doc. 200) and the motion for summary judgment of Davidsaver (doc. 205) are GRANTED.

Plaintiff Michael L. Malone shall take nothing on his direct Fourth Amendment excessive-force claim against Justin Stroud, and shall take nothing on his remaining bystander-liability claims against defendants Samuel Davidsaver, Christopher H. Watts, Mark Lynn Ball, Jaime Faigan, and Deena Evans, and all such claims against these defendants are DISMISSED WITH PREJUDICE.

SIGNED November 6, 2014.

_Terry R. Means_
_____
TERRY R. MEANS
UNITED STATES DISTRICT JUDGE