IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

MICHAEL L. MALONE            §
                             §
VS.                          §  CIVIL ACTION NO.4:09-CV-634-Y
                             §
CITY OF FORT WORTH, TEXAS,*et al.*§

OPINION AND ORDER GRANTING
CITY OF FORT WORTH MOTION FOR SUMMARY JUDGMENT

In this case, plaintiff Michael L. Malone has claims remaining against six police officers of the City of Fort Worth, Texas, individually, and against the City of Fort Worth itself ("Fort Worth").[1] Now before the Court is Fort Worth's motion for summary judgment. The motion is supported by a brief and an extensive appendix. Malone filed a response to the motion, which is also supported by a lengthy appendix. Fort Worth did not file a reply or challenge any of Malone's evidence.

## I. Background

Malone's claims arise from his forcible arrest on July 23, 2009, after he fled from Fort Worth police officers in a stolen truck for seven to eight minutes, only to be stopped on a dead-end street. Eleven Fort Worth police officers arrived at the arrest location either immediately or soon after Malone brought the truck to a stop. The issues to be resolved in this case arise primarily from what happened during the first two minutes or so after Malone

---

[1]The Court has previously dismissed some claims under 28 U.S.C. §§ 1915A and 1915(e) and granted summary judgment on claims against other individual defendants through separate orders and judgments under Federal Rule of Civil Procedure 54(b).

pulled the stolen pick-up truck to a stop. But what took place during Malone's pre-stop flight is also relevant.

Video evidence from the dashboard camera of Officer Davis's police cruiser shows that he was the lead car chasing the pick-up truck driven by Malone for the great majority of the pursuit. But seconds before the chase terminated, Officer Tidwell, a canine officer, inserted his vehicle immediately behind Malone's truck. Thus, Tidwell, accompanied by his dog, "Rocky", was the first officer to pull his police cruiser directly behind Malone's by-then-stopped truck. Tidwell was followed closely by Officer Davis and then the other officers. Tidwell allegedly injured Malone when he forcibly removed him from the truck through the driver's-side window, struck him with the muzzle end of his gun, struck him with his knee, and then either allowed or prompted the dog to attack Malone both before and after he was handcuffed.

After the Court's resolution of previous dispositive motions, Malone has remaining a cause of action against Fort Worth for excessive force in violation of the Fourth Amendment (including any potential bystander liability). Malone also asserts state-law causes of action against Fort Worth under the Texas Tort Claims Act due to Officer Tidwell's alleged negligence in the use of the dog and in the use of his gun to strike Malone.(Pl.'s Fourth Am. Compl.("FAC") (doc. 146) 56-58.)

After review of all relevant materials on file, the Court

concludes that no genuine disputes of material fact remain as to some elements of Malone's claims under § 1983 against Fort Worth. Accordingly, Fort Worth's summary-judgment motion as to those claims must be granted. Regarding Malone's state-law claims against Fort Worth for Officer Tidwell's use of the gun and dog, the Court concludes that Fort Worth is entitled to sovereign immunity, and such claims must be dismissed for lack of jurisdiction.

## II.    Summary-Judgment Evidence

A. Evidence Submitted by the Parties

In support of the motion for summary judgment, Fort Worth filed an appendix containing 186 pages of exhibits and a copy of a compilation DVD. (Fort Worth App.(docs. 278-1 through 278-6).) That appendix includes the following items, with a corresponding reference to each item's identifying letter: an August 30, 2016 Affidavit of Assistant Fort Worth Chief of Police Abdul Pridgen, along with copies of several sections of the Fort Worth Police Department General Orders (Sections 306, 314, 323.03, 410, 702, and 703), and a copy of portions of the Fort Worth Police Department Canine Unit Standard Operating Procedures Manual (Ex. A); an August 30, 2016 Affidavit of Fort Worth Police Department custodian of records Justin Seabourn, along with Texas Commission on Law Enforcement training records for each of the individual defendants remaining in this case (Officers Tidwell, Davis, Fields, Gipson,

Stroud, and Lehman), and training records for the police dog "Rocky" (Ex. B); and a DVD containing a recording of the dashboard camera video from Officer Davis's patrol vehicle ("Dash Cam View"), a recording of the camera video from a City of Fort Worth police helicopter hovering over the scene ("Aerial View"), a recording of portions of the radio communications between officers pursuing Malone in flight, and a compilation of both the aerial and dash-camera video angles onto one screen ("Compilation View") (Ex.C).

In response to the summary judgment motion, Malone filed an appendix containing 311 pages of materials, numbered sequentially.(Pl.'s App. (doc. 283-1) 1-314.)[2] At the back of the appendix is the declaration of Malone's counsel (*Id*. (doc. 283) 315-17) listing that he had provided true and correct copies of the following documents:

*the Internal Affairs Investigation File produced by the City of Fort Worth (*Id*. 1-188);

*the deposition transcript of Justin Stroud taken on October 24, 2013 (*Id*. 189-197);.

*the deposition transcript of James Fields taken on October 7, 2013 (*Id*. 198-206);

*the deposition transcript of Jason Gipson taken on October 15, 2013 (*Id*. 207-214);

*the deposition transcript of John Davis taken on October 4, 2013 (*Id*. 215-224);

*the General Orders produced by the City of Fort Worth (*Id*. 225-252);

---

[2]The page numbers in the Electronic Case Filing (ECF) system are slightly different than as numbered in the parties' appendices. The Court will cite to the document ("doc.") and page numbering assigned by the ECF system.

*the incident report and use-of-force report relating to
Officer Tidwell and Alan Christopher Keppler in September
2007 produced by the City of Fort Worth (*Id.* 253-272);

*Plaintiff's Brief in Support of his Response to Adrian
W. Tidwell's Motion for Summary Judgment in *Alan
Christopher Keppler v. City of Fort Worth, Texas and Fort
Worth Police Officer Adrian W Tidwell,* No. 4:09-CV-631-A
(*Id.* 273-284);

*Compromise Settlement Agreement between Alan Christopher
Keppler and Adrian W. Tidwell produced by City of Fort
Worth(*Id.* 285-292);

*Internal Affairs documents relating to complaints of use
of force and the investigation thereof produced by the
City of Fort Worth (*Id.* 293-303);

*written reprimands issued by the City of Fort Worth in
relation to complaints of use of force and the
investigation of them produced by the City of Fort Worth
(*Id.* 304-309); and

*the minutes of the Special City Council Meeting of the
City of Fort Worth, Texas, from November 10, 2009, a
public record retrieved from the records of the City of
Fort Worth via the City's website (*Id.* 310-311).

Fort Worth did not object to or contest Malone's evidentiary
materials.

B. Evidence on the Video and Audio Recordings

The Supreme Court, in *Scott v. Harris,* 550 U.S. 372 (2007),
held that where a videotape exists that discredits the nonmoving
party's version of events so that no reasonable jury could believe
it, the Court is required to view the facts in the light depicted
by the videotape. Although that is not the case in the instant
suit, the Court does have before it several videos in this case
that provide objective facts that dramatically assist this Court,
and that the Court has considered in resolving the Fort Worth

summary-judgment motion.

The Court previously issued an opinion and order resolving all of the individual defendants' motions for summary judgment, which were based on the affirmative defense of qualified immunity. (Nov. 6, 2014 Opinion and Order (doc. 247).) In that opinion, this Court included a detailed chronology of what the video evidence revealed as to each officer's conduct. (*Id.* 6-12.) That detailed chronology was necessary to the resolution of the qualified-immunity motions, but not to resolve the issues addressed here. The Court, however, takes judicial notice of this objective video record of what took place on the evening of July 23, 2009.

## III. Summary Judgment Standard

When the record establishes "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law," summary judgment is appropriate. Fed. R. Civ. P. 56(a). "[A dispute] is 'genuine' if it is real and substantial, as opposed to merely formal, pretended, or a sham." *Bazan v. Hidalgo Cty.*, 246 F.3d 481, 489 (5th Cir. 2001) (citation omitted). A fact is "material" if it "might affect the outcome of the suit under governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

To demonstrate that a particular fact cannot be genuinely in dispute, a defendant movant must (a) cite to particular parts of materials in the record (e.g., affidavits, depositions), or (b)

show either that (1) the plaintiff cannot produce admissible evidence to support that particular fact, or (2) if the plaintiff has cited any materials in response, show that those materials do not establish the presence of a genuine dispute as to that fact. *See* Fed. R. Civ. P. 56(c)(1). Although the Court is **required** to consider only the cited materials, it **may** consider other materials in the record. *See* Fed. R. Civ. P. 56(c)(3). Nevertheless, Rule 56 "does not impose on the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment." *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915-16 n.7 (5th Cir. 1992). Instead, parties should "identify specific evidence in the record, and . . . articulate the 'precise manner' in which that evidence support[s] their claim." *Forsyth v. Barr*, 19 F.3d 1527, 1537 (5th Cir. 1994).

In evaluating whether summary judgment is appropriate, the Court "views the evidence in the light most favorable to the nonmovant, drawing all reasonable inferences in the nonmovant's favor." *Sanders-Burns v. City of Plano*, 594 F.3d 366, 380 (5th Cir. 2010)(citation omitted) (internal quotation marks omitted). "After the non-movant has been given the opportunity to raise a genuine factual [dispute], if no reasonable juror could find for the non-movant, summary judgment will be granted." *Byers v. Dallas Morning News, Inc.*, 209 F.3d 419, 424 (5th Cir. 2000) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

**IV.  Municipal Liability for § 1983 Claims**

A.  Applicable Standards

Malone seeks relief in this case under 42 U.S.C. § 1983, which creates a private right of action for persons who have had their federal civil rights violated by someone acting under color of state law. *Colson v. Grohman,* 174 F.3d 498, 504 n.2 (5th Cir. 1999)(citing *Migra v. Warren City Sch. Dist. Bd. of Educ.,* 465 U.S. 75, 82 (1984)). "Rather than creating substantive rights, § 1983 simply provides a remedy for the rights that it designates. Thus, an underlying constitutional or statutory violation is a predicate to liability under § 1983." *Harrington v. Harris,* 118 F.3d 359, 365 (5th Cir. 1987)(citations and internal marks omitted)(quoting *Johnson v. Harris Cty. Flood Control Dist.,* 869 F.2d 1565, 1573 (5th Cir. 1989)).

As recounted in its prior opinion and order addressing the summary-judgment motions of the individual officers, the Court determined that material fact disputes exist regarding the presence of underlying constitutional violations. The first is whether Tidwell's conduct in striking Malone and in the deployment of "Rocky" amounted to excessive force under the Fourth Amendment. The second is whether the remaining individual officers had, but shirked, a bystander duty to intervene to stop that alleged use of excessive force. Thus, as the Court has already determined that Malone has demonstrated evidence of underlying constitutional violations, the Court now turns its attention to whether he has

viable claims against Fort Worth as a result of these alleged constitutional violations.

(1) Policy or Custom Generally

Although a city is a "person" within the meaning of § 1983, a municipal government may not be held liable "unless action pursuant to official municipal policy of some nature caused a constitutional tort." *Monell v. New York City Dept. of Soc. Servs.*, 436 U.S. 658, 691 (1978). In *Monell*, the Supreme Court emphasized that a local government entity cannot be held liable under § 1983 on a *responde-at superior* basis:

> [T]herefore . . . a local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom . . . inflicts the injury that the government entity is responsible under § 1983.

*Id.* at 694. Because a municipality cannot be held vicariously liable for the constitutional torts of its employees or agents under § 1983, the official-policy requirement was established

> to distinguish acts of the *municipality* from acts of *employees* of the municipality, and thereby make clear that municipal liability is limited to action for which the municipality is actually responsible. *Monell* reasoned that recovery from a municipality is limited to acts that are, properly speaking, acts "of the municipality" – that is, acts which the municipality has officially sanctioned or ordered.

*Pembaur v. City of Cincinnati,* 475 U.S. 469, 479 (1986)(footnote omitted). Thus, § 1983 liability attaches against a local government entity only "if the governmental body itself 'subjects' a person to a deprivation of rights or 'causes' a person 'to be

subjected' to such deprivation." *Connick v. Thompson,* 563 U.S. 51, 59 (2011)(quoting *Monell,* 436 U.S. at 692); *City of Canton v. Harris,* 489 U.S. 378, 385 (1989).

Consequently, to establish municipal liability under § 1983, a plaintiff must prove three elements: (1) an official policy or custom, of which (2) a policymaker can be charged with actual or constructive knowledge, and (3) a constitutional violation whose moving force is that policy or custom. *Valle v. City of Houston,* 613 F.3d 536, 541 (5th Cir. 2010)(citing *Pineda v. City of Houston,* 291 F.3d 325, 328 (5th Cir. 2002)). So a plaintiff must first identify an official policy of the municipality, which may take the form of:

> 1. A policy statement, ordinance, regulation, or decision that is officially adopted and promulgated by the municipality's lawmaking officer or by an official to whom the lawmakers have delegated policy-making authority; or
>
> 2. A persistent, widespread practice of city officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly represents municipal policy. Actual or constructive knowledge of such custom must be attributable to the governing body of the municipality or to an official to whom that body had delegated policy-making authority.

*Johnson v. Deep E. Tex. Reg'l Narcotics Trafficking Task Force*, *et al.*, 379 F.3d 293, 309 (5th Cir. 2004)(quoting *Johnson v. Moore*, 958 F.2d 92, 94 (5th Cir.1992)); *see also Prince v. Curry,* 423 F. App'x 447, 450 (5th Cir. 2011)(official municipal policy "includes the decisions of [the municipality's] lawmakers, the acts of its

policymaking officials, and practices so persistent and widespread as to practically have the force of law")(quoting *Connick,* 563 U.S. at 60.)

Next, a plaintiff must establish that the identified policy came from a policymaker of the municipality. "A policy or custom becomes official for purposes of § 1983 when it results from the decision or acquiescence of the municipal officer or body with 'final policymaking authority' over the subject matter of the offending policy." *Gros v. City of Grand Prairie*, 181 F.3d 613, 615 (5th Cir. 1999) (citing *Jett v. Dallas Ind. Sch.*, 491 U.S. 701, 737 (1989)). If the policy arises from a persistent widespread practice or custom that is so common it could be said to represent municipal policy, actual or constructive knowledge of such practice or custom must be shown. *See Hicks-Fields v. Harris Cty.,* 860 F.3d 803, 808 (5th Cir. 2017). In the Fifth Circuit,

> [a]ctual knowledge may be shown by such means as discussion at council meetings or receipt of written information. Constructive knowledge may be attributed to the governing body on the ground that it would have known of the violations if it had properly exercised its responsibilities, as, for example, where the violations were so persistent and widespread that they were the subject of prolonged public discussion or a high degree of publicity.

*Id.*(citing *Bennett v. City of Slidell,* 728 F.2d 768 (5th Cir. 1984)).

Finally, a plaintiff must "demonstrate that, through its *deliberate* conduct, the municipality was the 'moving force' behind the injury alleged. That is, a plaintiff must show that the

municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal [policy] and the deprivation of federal rights." *Bd. of Cty. Comm'rs of Bryan Cty., Okla. v. Brown*, 520 U.S. 397, 404 (1997). For a municipality to be liable on account of its policy or custom, the plaintiff must show that (1) the policy *itself* violated federal law or authorized or directed the deprivation of federal rights, or (2) the policy was adopted or maintained with deliberate indifference as to the known or obvious consequence that it would result in the violation of someone's federal rights. *Deep E. Tex.*, 379 F.3d at 309 (citations omitted).

Where the plaintiff can prevail only by showing option (2), that is, by showing that the suspect policy was adopted or maintained with deliberate indifference, a demonstration of at least a pattern of similar violations of federal rights is generally required. *See id.* A single violation or even a handful of violations likely will not be enough for a court to conclude that a municipality maintained the policy with deliberate indifference to the rights of persons within its jurisdiction. Without notice that a facially lawful policy is resulting in violations of federal rights, a municipality cannot be said to be deliberately indifferent to a result. *See Bd. of Cty. Comm'rs,* 520 U.S. at 408.

(2) Policy or Custom as to Training

"In limited circumstances, a local government's decision not to train certain employees about their legal duty to avoid

violating citizen's rights may rise to the level of an official government policy for purposes of § 1983." *Connick,* 563 U.S. at 61. The Supreme Court emphasized in *Connick* that "[a] municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Id.* In assessing whether a training policy and procedure is inadequate, courts look to "whether the program 'enable[s] officers to respond properly to the usual and recurring situations with which they must deal.'" *Hicks-Fields,* 860 F.3d at 811 (quoting *Benavides v. Wilson Cty.,* 955 F.2d 968, 973 (5th Cir. 1992)(citing *City of Canton,* 489 U.S. at 391)). An inadequate training program or a failure to train, once shown to be an official policy or custom of which a municipality has knowledge, may serve as the basis for § 1983 liability only where inadequate training amounts to deliberate indifference to the rights of the persons with whom the police come into contact. *City of Canton,* 489 U.S. at 388. It follows that to hold a municipality liable under § 1983 based on a policy of inadequate training, a plaintiff must demonstrate that "(1) [the municipality's] training policy was inadequate, (2) [the municipality] was deliberately indifferent in adopting its training policy, and (3) the inadequate training policy directly caused [the constitutional violation]". *Kitchen v. Dallas Cty.,* 759 F.3d, 468, 484 (5th Cir. 2014) (quoting *Sanders-Burns,* 594 F.3d at 381), *abrogated in part on other grounds, Kingsley v. Henderson,* 135 S.Ct. 2466, 2473-76 (2015); *accord Benavides*, 955 F.2d at 972

13

(citing *City of Canton,* 489 U.S. at 389-392).

The requisite deliberate indifference in an inadequate-training context may be shown by a plaintiff in one of two ways. *Kitchen*, 759 F.3d at 484. The first and "more typical approach" is to demonstrate that a municipality had "'[n]otice of a pattern of similar violations,' which were 'fairly similar to what ultimately transpired' when the plaintiffs own rights were violated."*Id.* (quoting *Sanders-Burns*, 594 F.3d at 381.) "Establishing deliberate indifference [under this first approach] generally requires a showing that the municipality failed to change its training methods in the face of several incidents in which training methods caused constitutional violations." *Cardenas v. Lee Cty.,* 569 F. App'x 252, 257-58 (5th Cir. 2014)(citations omitted). The second approach allows for a finding of deliberate indifference based on a single incident in a narrow range of circumstances where a constitutional violation is likely to result as the highly predictable consequence of a particular failure to train. *See Kitchen,* 759 F.3d at 484. This "single-incident exception" is a narrow one, and "to rely on the exception 'a plaintiff must prove that the highly predictable consequence of a failure to train would result in the specific injury suffered, and that the failure to train represented the moving force behind the constitutional violation.'" *Sanders-Burns,* 594 at 381 (5th Cir. 2010)(quoting *Davis v. City of N. Richland Hills,* 406 F.3d 375, 383 N.34 (5th Cir. 2005)); *see also Cardenas*, 569 F. App'x at 257-58 (noting that Supreme Court in City of Canton

gave as example a police department arming officers but failing to train them as to deadly force) (citing *City of Canton,* 489 U.S. at 390 n.10).

(3) Policy or Custom as to Supervision

Claims based on failure to supervise or inadequate supervision can similarly give rise to municipal liability under § 1983 when a municipality "supervises its employees in a manner that manifests deliberate indifference to the constitutional rights of citizens." *Doe v. Taylor Indep. Sch. Dist.*, 15 F.3d 443, 453 (5th Cir. 1994). Failure-to-supervise claims are governed by the same deliberate-indifference standard regardless of whether they are based on municipal liability or individual supervisory liability. *Id.* ("The legal elements of an individual's supervisory liability and a political subdivisions's liability . . . are similar enough that the same standards of fault and causation should govern"); *see also Callaway v. Travis Cty.,* No. A-15-CA-103-SS, 2016 WL 4371943, at *11 n.10 (W.D. Tex. July 28, 2016). To prevail on a failure-to-supervise claim, the plaintiff must show that (1) the supervision policies of the municipality were inadequate, (2) the municipality was deliberately indifferent in adopting such polices, and (3) the inadequate-supervision policies directly caused the plaintiff's injuries. *See Callaway,* 2016 WL 4371943, at *11 n. 10 (citing *Baker v. Putnal,* 75 F.3d 190, 200 (5th Cir. 1996), and *City of Canton*, 489 U.S. at 389-92).

Proof that a single constitutional violation resulted from inadequate supervision is ordinarily insufficient to hold a municipality liable for inadequate supervision. *Thompson v. Upshur Cty.*, 245 F.3d 447, 459 (5th Cir. 2001)(citing *Snyder v. Trepagnier*, 142 F.3d 791, 798-99 (5th Cir. 1998)). The plaintiff must usually demonstrate a pattern of similar violations to establish the deliberate indifference required to impose municipal liability for failure to supervise. *Id*. (citation omitted). Only when a failure to train or supervise reflects a "deliberate" or "conscious" choice can a municipality be liable for such a failure under § 1983. *See City of Canton*, 489 U.S. at 388-89. The need for more or different training or supervision must be "so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the [city] can reasonably be said to have been deliberately indifferent to the need," and "the failure to provide proper training [or supervision] may fairly be said to represent a policy for which the [city] is responsible." *See Longoria v. Dallas Cty., et al.*, No. 3:14-CV-3111-L, 2017 WL 958605, at * 13 (N.D. Tex. 2017)(quoting *City of Canton*, 489 U.S. at 390), *vacated in part on reconsideration,* 2018 WL 339311 (N.D. Tex. 2018)(Lindsey, J.). For Fort Worth to be liable for failure to supervise, "it at least must have been obvious that 'the highly predictable consequence' of not supervising its officers was that they 'would apply force in such

16

a way that the Fourth Amendment rights of [citizens] were at risk.'" *Peterson v. City of Fort Worth*, 588 F.3d 838, 850 (5th Cir. 2009)(quoting *Brown,* 219 F.3d at 461).

B.   Application of the Standards to the Summary-Judgment Evidence

The Court will commence its analysis by stating in more specific terms the Rule 56 requirement that Fort Worth must meet before its motion for summary judgment may be granted:  because Malone has cited materials in the record in opposition to Fort Worth's motion for summary judgment, Fort Worth must now show that Malone's cited materials do not establish the presence of a genuine dispute of material fact as to at least one of the elements required for municipal liability.

Malone and Fort Worth join issue on three questions--three separate bases Malone asserts for Fort Worth's liability under § 1983.  The first is (1) whether Fort Worth had a practice or custom of deference by its regular police officers to its canine officers that either (a) itself violated Malone's constitutional rights, (b) authorized or directed such a violation, or (c) was adopted or maintained by Fort Worth with deliberate indifference to the obvious consequence that it would violate someone's constitutional rights. *See Deep E. Tex.*, 379 F. 3d at 309; *Bd. of Cty*, 520 U.S. at 406-07. The last two are whether Fort Worth, in deliberate indifference to the rights of its citizens, (2) mis-trained its regular officers to defer to canine officers too greatly or (3)

failed to supervise its canine officers, and in particular Tidwell, directly resulting in the violation of Malone's constitutional rights. *See City of Canton,* 489 U.S. at 389 (training); *Longoria,* 2017 WL 958605, at * 13 (supervision).

> Question (1): Is there a Practice or Custom of Deference by Regular Officers to Canine Officers, Adopted or Maintained with Deliberate Indifference, Resulting in a Violation of Malone's Rights?

As noted above, the "official municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law." *Connick,* 563 U.S. at 61 (citations omitted). Malone does not claim any officially adopted policy. Rather, he relies on the latter category, attempting to demonstrate official policy through practice or custom. Malone must therefore demonstrate that there existed "[a] persistent widespread practice of city officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly represents municipal policy." *Hicks-Fields,* 860 F.3d at 808 (citing *Webster v. City of Houston,* 735 F.2d 838, 841 (5th Cir. 1984)).

\* Evidence of a practice or custom of deference

Malone's response to Fort Worth's summary-judgment motion directs the Court to certain Fort Worth records, portions of deposition testimony of the individual officers, and other pertinent materials. And Fort Worth helpfully quotes a section of

its General Orders providing that the "canine officer has responsibility for the police service canine and determining when circumstances warrant using the canine off leash in . . . situations involving dangerous suspects." (Fort Worth App. at 14 (Gen. Ords. 323.03(B)(5)&(6)).) There is ample evidence that, working in tandem with that General Order, it is the custom and training of regular police officers to defer to the actions of the canine officer.

The strongest evidence of this custom is the sworn testimony of several bystander officers that once a dog is deployed the canine officer is assumed to be in charge of the scene and all other officers must defer to him. Specifically, Officer Stroud testified under examination by Malone's counsel:

> A (by Stroud): "Am I trained to judge whether the dog is appropriately being used or not?
>
> Q (by Counsel): "Yes sir."
>
> A: "No sir."
>
> Q: Are you trained to see a dog on a suspect, to observe and see if the use of that dog is excessive force?"
>
> A: "No sir."
>
> Q: "You're trained just to stand back and not interfere?"
>
> A: "Yes sir, let the K-9 officer handle the situation."

(Pl.'s App. (doc. 283-1) 192.)

Similarly, Officer Fields testified that "if there is a dog on

scene, the K-9 handler is the only person trained to use that dog, so therefore--in that case they're in charge of the scene at that point." (*Id.* 200-201.) And more specific to this arrest, Officer Fields testified:

> Q: "When you pulled up at the termination of the vehicle pursuit, had Officer Tidwell deployed the dog?"
>
> A: "Yes."
>
> Q: "And under your training that means it's [Tidwell's] scene at that point?"
>
> A: "Right."

(*Id.* 201.)

Officer Gipson swore that "[d]uring field training we're instructed if there's a K-9 unit on scene of our call, that K-9 unit is in charge. They take primary, and we're just there to assist them in whatever it is they need on that call." (*Id.* 209.)

Also under examination by Malone's counsel, Officer Davis testified:

> Q: "Were you trained to stay away from police dogs when they were deployed?"
>
> A: "We were trained to defer control to the K-9 officer."
>
> Q: "What was . . . that training? What were you told to do?"
>
> A: "I really didn't have any training per se for K-9."

(*Id.* 219.) Thus, four of Fort Worth's police officers have sworn to facts from which it may be inferred that their employer, Fort Worth, adopted or maintained a custom of deference by regular

police officers to canine officers.

> *Evidence that Fort Worth had actual or constructive knowledge of this custom?

Even if the evidentiary materials recited above demonstrate that there is a practice or custom of deference by regular police officers to canine officers, Malone must also establish "'actual or constructive knowledge of such custom' by the municipality or the official who had policymaking authority." *Hicks-Fields,* 860 F.3d at 808 (citing *Webster v. City of Houston,* 735 F.2d 838, 841 (5th Cir. 1984)). Other than providing the evidentiary materials recited above showing the practice or custom of deference, Malone has provided no evidence to show actual knowledge of the practice or custom by a Fort Worth policymaker. Malone presents no evidence that the issue was considered at a Fort Worth council meeting or other official meeting, nor has he demonstrated a prior awareness of the practice through written information presented to Fort Worth officials. Thus, there is no evidence to show actual knowledge by Fort Worth of such practice or custom.

Further, Malone has failed to provide evidence to show any persistent or widespread violations of citizen's rights arising from actions where regular police officers are present with canine officers. In this regard, Malone has presented no evidence of any prior arrest with use-of-force events involving canines. Malone has provided no evidence of any persistent or widespread instances of excessive force arising from improper regular police officer

deference to a canine officer. Malone has therefore not raised any material fact dispute as to the requisite knowledge by Fort Worth officials of a custom or practice of regular police officers deferring to canine officers.

> \*Evidence that the custom was adopted or maintained with deliberate indifference (to show culpability and moving force)?

Furthermore, in addition to having to show a policy, practice or custom of Fort Worth, Malone must present evidence demonstrating that the policy (or practice or custom in this case) is the moving force behind the violation of Malone's constitutional rights. Malone has cited nothing in his appendix or elsewhere that shows that Fort Worth's alleged custom of deference (a) itself violated Malone's constitutional rights or (b) authorized or directed such a violation. This leaves for analysis only (c) whether the practice or custom was adopted or maintained with deliberate indifference to its known consequences. *See Johnson,* 379 F.3d at 309. Such an analysis "'generally requires that a plaintiff demonstrate at least a pattern of similar violations.'" *Id.* at 309–310 (quoting *Burge v. St. Tammany Parish*, 336 F.3d 370 (5th Cir. 2003))(other citations omitted).

In Malone's live pleading he asserts five specific incidents where officers employed excessive force during arrests or after catching fleeing suspects and alleges but does not specifically identify "dozens of other reports of excessive force during

arrests." (Pl.'s FAC (doc. 146) ¶ 135.) First, although Malone pleaded five instances where officers allegedly used excessive force on fleeing suspects, he has neither alleged nor presented evidence demonstrating that four of these events involved canine officers. The only one of these five incidents that allegedly involved the use of a canine was a 2007 incident involving Officer Tidwell and arrestee Alan Christopher Keppler, where Tidwell was alleged to have "threatened a dog attack against an arrestee." *Id.* Malone provided extensive information about that event in the appendix to his response, including Fort Worth investigative reports and documents from the resulting litigation in *Keppler v. City of Fort Worth*, No. 4:09-CV-631-A. (*Id.* 250-289.) None of those documents indicate, however, that the event actually involved use of a canine.

In his appendix, Malone has also included evidence of five instances of citizen complaints about Fort Worth officer conduct and two written reprimands of officers for use of excessive force. (*Id.* 290-306.) None of this evidence includes any allegation of the use of a canine, however, or allegations of regular police officers interacting with a canine officer in a manner that resulted in an injury to a citizen.[3]

Thus, the evidence provided by Malone gives no support to a

---

[3]This evidence is also considered *infra* in section IV (B)(3) regarding Malone's claims against Fort Worth based upon a failure to supervise canine officers.

claim that similar incidents regarding regular officer deference to canine officers have taken place, much less that there were a sufficient number of prior incidents to put Fort Worth officials on notice that its policy of requiring deference by regular officers to canine officers would result in violations of the constitutional rights of Fort Worth's residents or visitors. Therefore, although Malone has presented evidence demonstrating the presence of a custom or practice of regular police officers deferring to canine officers, he has not presented evidence showing Fort Worth's knowledge of that custom or practice, nor has he presented evidence demonstrating that any such practice or custom was maintained with deliberate indifference to the obvious consequence that Malone's rights would be violated.

> Question (2): Did Fort Worth's Inadequate Training of Regular Police Officers as to Canine Officers Result in a Violation of Malone's rights?

In addition to the claim against Fort Worth based on a policy of improper deference by regular officers to canine officers, Malone next contends that Fort Worth failed to properly train its regular police officers as to their interaction with canine officers. (Pl's Resp.(doc. 283) at 9.) Malone points out that although Fort Worth claims in its summary-judgment motion that its regular police officers have a duty to intervene if they observe the use of excessive force, Fort Worth does not actually identify the content of any such training. Thus, Malone essentially contends

that Fort Worth failed to train its regular officers to intervene when a canine officer deploys a canine to apply excessive force against a person in the city.

As noted above, a local government's decision not to train employees about the duty to avoid violating citizen's rights may rise to the level of an official government policy. *See Hicks-Fields,* 860 F.3d at 811. To succeed on such a claim, Malone must demonstrate that (1) Fort Worth's training policies were inadequate, (2) Fort Worth was deliberately indifferent in adopting the training policy, and (3) the inadequate training directly caused the constitutional violations. *See Trammell v. Fruge*, 868 F.2d 332, 345 (5th Cir. 2017)(citing *Zarnow v. City of Wichita Falls*, 614 F.3d 161, 170 (5th Cir. 2010).)

> \* Evidence that Fort Worth had an inadequate training policy with regard to regular police officers interaction with canine officers

As explained in the prior section of this opinion, Malone has presented evidence that Fort Worth's regular police officers received no training with regard to the use of canines, other than that they are to stand back and not interfere when they are on-site with a canine officer. With regard to the requisite element that this particular training was inadequate, the Court concludes that this same evidence raises material fact disputes.

In a further effort to satisfy his burden to provide evidence of inadequate training of regular officers as to canine officers,

Malone also presents the report of Captain G. Ghilespi prepared for Deputy Chief A. Pridgen as a part of the Internal Affairs review of the arrest of and use-of-force against Malone.[4] (Pl.'s App. (doc. 283) 12-15.) In that document, Captain Ghilespie lists his conclusions and recommendations:

CONCLUSION

It is clear that several areas of concern in this incident shall be addressed by training. Felony Stops, and related tactics at pursuit termination, as well as the use of the K9 partner wherein the suspect is still inside a running vehicle are areas at a minimum, which will be reviewed.

RECOMMENDATION

I agree with Sergeant Norris [Internal Affairs Investigator] that training be designed to enhance our Unit skills, in addressing persons who are seated in vehicles and that must be taken into custody after verbal commands have failed, (as well as related deployment of the K9 partner in such circumstances).

(*Id.* 14, 15.) Although this document shows that Fort Worth acknowledges the need for more training, it arose after and as result of this event. This Internal Affairs review cannot show Fort Worth's knowledge of the need for more particular training of regular officers and their interaction with canine officers prior to the arrest of Malone. But even if the Court assumes this document raises a material dispute relating to Fort Worth's knowledge of the adequacy of its training policy regarding regular

---

[4]Malone also presents Pridgen's affidavit, which relates that he has now risen to the rank of Assistant Chief of Police. (Fort Worth's App. (doc. 277) Ex. A.)

officer engagement with canine officers, Malone must also present evidence demonstrating that Fort Worth was deliberately indifferent in adopting the inadequate training and that such training directly caused Malone's injury.

> \* Evidence that Fort Worth was deliberately indifferent in adopting or maintaining an inadequate training policy

"Deliberate indifference" is characterized as a "stringent standard of fault requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Connick*, 563 U.S. at 61 (quoting *Bd of Comm'rs of Bryan Cty.*, 520 U.S. at 410(citing *Conner v. Travis Cty.*, 209 F.3d 794, 796 (5th Cir. 2000)(per curiam)). It is "difficult to show deliberate indifference . . . where the City has implemented at least some training." *Valle*, 613 F.3d at 548 (concluding that City was not deliberately indifferent in police shooting of mentally disturbed man where it had trained a corp, but not all, officers in crisis intervention). As noted above, one way for a plaintiff to show deliberate indifference to the need for additional training is to demonstrate that the municipality had notice of a pattern of prior violations similar to what ultimately transpired. "A pattern of similar constitutional violations by untrained employees is ordinarily necessary to demonstrate deliberate indifference for purposes of failure to train." *Connick,* 563 U.S. at 62. But Malone has not presented evidence of any pattern of regular officers failing to stop a canine officer's use of excessive force so as to

support a claim that Fort Worth was deliberately indifferent to the adequacy of its training program based upon a pattern of similar violations.

As previously noted, however "under certain circumstances, § 1983 liability can attach for a single decision not to train an individual officer even where there has been no pattern of previous constitutional violations." *Brown v. Bryan County,* 219 F.3d 450, 459 (5th Cir. 2000). This "single incident exception," which would hold a municipality liable for a failure to train, is extremely narrow, requiring a plaintiff to demonstrate the "'highly predictable' consequence of a failure to train would result in the specific injury suffered, and that the failure to train represented the 'moving force' behind the constitutional violation." *Estate of Davis ex rel. McCully v. City of N. Richland Hills*, 406 F.3d 375, 385-86 (5th Cir. 2005).

Although the Fifth Circuit relied upon the single-incident exception in the *Brown* case, the circumstances were unique. There, the plaintiff was injured during a traffic stop when a deputy sheriff threw her to the ground. *See id.* at 454. In support of the plaintiff's claim of § 1983 liability for failure to train the deputy, the record revealed that: the deputy, only 20 years old, had received no formal law enforcement training and had a known history of disciplinary problems; the situation admittedly was known by the policymaker sheriff; and the sheriff nonetheless

allowed the deputy to assist in patrols. Evidence also existed that the deputy's lack of training directly caused the plaintiff's injuries. *Id*. at 454-56, 458. While reiterating the stringent standard imposed by *City of Canton,* the Fifth Circuit concluded that deliberate indifference could be inferred against the county by its hiring of a deputy with known disciplinary problems coupled with the county's failure to provide him with any training or supervision. *Id*. at 462, 465.

This case differs substantially from the facts underlying *Brown* and does not otherwise meet this "extremely narrow" exception. Fort Worth has presented evidence demonstrating that its officers are required to meet the statutory requirements of training for peace officers set by the Texas Commission on Law Enforcement, and that the Fort Worth Police Department uses a training program to continually train its officers on its policies, such as arrest procedures and use of force. Assistant Chief Pridgen states in his affidavit that the "Fort Worth Police Department requires officers to intervene if they believe the force being used against an individual is excessive." (Fort Worth's App. (doc. 278-1) at 6.) Fort Worth has also presented evidence that each of the regular police officers that are defendants in this suit received extensive training over the course of their many years of employment.(*Id.* (doc. 278-3) Ex. B Seabourn Affidavit; (doc. 278-4) at 8-12 (Davis), 13-18 (Stroud), 19-23 (Lehman), 24-30 (Fields), 31-36 (Gipson).) None of these regular police officers had any disciplinary history similar to that at issue

in *Brown*. Malone has not presented evidence in response.

Thus, Malone has presented no evidence of a pattern of similar constitutional violations resulting from inadequate training, nor has he satisfied the "single-incident exception" by showing that it should have been obvious to the policymakers that the risk of injury was a "highly predictable consequence" of the failure to train the regular officers regarding canine officers. Malone has thus failed to create a genuine dispute of material fact on his claim that Fort Worth was deliberately indifferent regarding its training of the regular police officers as to their engagement with canine officers.

> Question (3): Is there Evidence of Deliberate Indifference in the Supervision of the Canine Officers resulting in Violation of Malone's rights?

Malone also alleges that Fort Worth was deliberately indifferent to the need to provide adequate supervision to its canine officers, and in particular to Officer Tidwell. Like the standards applicable to a failure to train, to hold a local government liable for failure to supervise a plaintiff must show "(1) the municipality's supervision was inadequate, (2) the municipality's policymaker was deliberately indifferent in supervising the subordinates, and (3) the inadequate supervision directly caused the plaintiff's injury." *Clyce v. Hunt Cty.*, 515 F. App'x 319, 323 (5th Cir. 2013)(citations omitted). Again, for Fort Worth to be liable for failure to supervise on the basis of this

single incident, "it at least must have been obvious that the 'highly predictable consequence' of not supervising its officers was that they 'would apply force in such a way that the Fourth Amendment rights of [citizens] were at risk." *Peterson v. City of Fort Worth,* 588 F.3d 838, 850 (5th Cir. 2009)(citing *Brown v. Bryan Cty.,* 219 F.3d at 461)).

 * Evidence of inadequate supervision of canine officers

In support of its motion, Fort Worth presents the Court with some of its procedures applicable to canine officers from its "Fort Worth Police Department Canine Unit Standard Operating Procedures Manual." (Fort Worth App. (doc. 278-2) 30-54.) In his arguments regarding the failure to properly supervise Tidwell, Malone contends that there are inconsistencies between these canine unit procedures and the Fort Worth General Orders. For example, although the general orders do not contain directives as to when or how a canine officer should be involved in a vehicle pursuit, the Canine Unit's Standard Operating Procedure includes explicit language in that regard:

> *Canine units will not normally be involved in vehicle pursuits.* However, if a canine unit initiates a vehicle pursuit, they may continue the pursuit until such time that a marked patrol unit can take over the pursuit. For officer safety, a canine unit may join or will remain in the pursuit as the second unit until another patrol unit can take that position. Once the canine unit releases the pursuit to patrol units, *the canine unit will not be involved in the pursuit in any manner.*

> If a canine officer is notified of a vehicle pursuit and is near the area where the pursuit terminates, they may

proceed to the termination location to assist in the
search for and apprehension of the suspects. However, the
canine unit may only proceed at code one[5] unless directed
by dispatch or a supervisor.

(*Id.* 36 (emphasis added).)

Thus, under Fort Worth's existing canine procedures manual,
Officer Tidwell, as a canine officer, should not have continued in
pursuit of Malone's vehicle and should not have been the first
officer to engage Malone at the termination of the pursuit. (Pl's
App. (doc. 283-1) at 244-45 (General Orders Manual § 305.03(D)(7)
& (8)(officer initiating pursuit in charge of apprehension); 217
(Deposition of Davis (Davis initiated pursuit)); 218 (Davis arrived
as the second vehicle just seconds behind Tidwell)). Malone
contends that when coupled with the evidence that regular officers
are trained to defer to canine officers, Tidwell's violation of
canine officer policies left him essentially unsupervised at the
scene: once Tidwell deployed his canine, Davis and all of the other
officers apparently acted consistently with their training to not
interfere with the use of that canine.

Additionally, Malone contends that Fort Worth is liable for
failing to supervise Tidwell because Tidwell had a prior excessive-
force incident that ended in litigation, and because the Internal
Affairs investigation of his conduct regarding this incident was
inadequate. Malone suggests this inadequacy is consistent with

---

[5]To proceed at code one means to proceed in a routine manner and to
"[r]espond without delay/obey all traffic laws." (Pl.'s App. (doc. 283-1) at 252,
Code 601.02).

other incidents of complaints of excessive force that resulted in Internal Affairs reviews. The Fifth Circuit has recognized that municipal liability may arise from a plaintiff's allegations that a city failed to properly discipline its employees. *See Piotrowski v. City of Houston*, 237 F.3d 567, 581 (5th Cir. 2001)("Self-evidently, a City policy of inadequate officer discipline could be unconstitutional if it was pursued with deliberate indifference toward the constitutional rights of citizens.") There the court acknowledged that one way to support a finding of municipal liability in such contexts "might be a purely formalistic investigation in which little evidence was taken, the file was bare, and the conclusions of the investigator were perfunctory." *Id*. at 582. Malone appears to rely on this precedent, reciting five examples of citizen complaints of excessive force that resulted, in each case, in an Internal Affairs department review that exonerated the officer, and two other Internal Affairs cases where officers were given a "written reprimand" in their permanent file for the use of excessive force and informed of the potential for further disciplinary action. (Pl.'s App. (doc. 283-1) 293-309.) The Court must now turn to the question of whether any of this evidence is sufficient to show Fort Worth's deliberate indifference, and if so, whether that indifference caused Malone's injuries.

> \* Evidence that inadequate supervision of canine officers was deliberately indifferent

Malone must raise a factual dispute as to whether Fort Worth

was deliberately indifferent in the supervision of Officer Tidwell, and that such inadequate supervision of Tidwell caused Malone's injuries. The Fifth Circuit has recognized that "a municipality is subject to § 1983 liability when the municipality's policies regarding employee . . . supervision were obviously inadequate, and the resulting lack of . . . supervision was likely to (and actually did) lead to a constitutional violation." *Drake v. City of Haltom City,* 106 F. App'x 897, 899 (5th Cir. 2004). Malone has failed to meet that burden.

In the Internal Affairs Report of this arrest incident, Captain Ghilespie provided this summary:

> It is readily apparent in the overall scope of the incident that Officer Tidwell and perhaps other personnel at the scene allowed the excitement and adrenaline of the incident as instigated by the suspect's dangerous and criminal actions take precedence in the overall tactical outcome and arrest process. Specifically, a Felony Stop as described in General Orders policy was not attempted (at the final termination point) of the pursuit. Rather Tidwell ended-up [sic] immediately outside the driver's door with his K9 partner, and attempting to order the suspect out of the stolen vehicle from that physical position. While it may have become necessary to approach the vehicle at some point to make the physical apprehension, the Felony Stop was not attempted. The driver had indeed previously demonstrated that he would go to extreme and dangerous measures to elude the officers, however at the termination point the tactical choices that were selected were not ideal, and increased the level of physical danger to Tidwell and the involved Patrol personnel.

(Pl.'s App. (doc. 283-1) 12.) As implied in this report, at the immediate moment when the vehicle pursuit stopped, if Officer Tidwell had followed Fort Worth canine policy and waited just a few

seconds to consult with Officer Davis, it is possible that the regular police officers may have first approached Malone's vehicle, and that the canine would not have been deployed or deployed in a different manner.

But Malone has not demonstrated that Tidwell's actions in immediately pulling his gun, deploying the canine off-leash, and running towards the stolen truck in which Malone was sitting resulted from any lack of supervision of him. Rather, as indicated in the Internal Affairs report, Tidwell's actions were taken in the "excitement and adrenaline of the incident." Tidwell's decision to take these actions was contrary to Fort Worth policy, thus negating any claim that Tidwell's conduct resulted from inadequate supervision. Tidwell's violation of Fort Worth policy cannot be the basis for imposing liability on Fort Worth. *See Valle*, 613 F.3d at 543 (noting that "'[w]hen an official's discretionary decisions are constrained by policies not of that official's making, those policies, rather than the subordinate's departures from them, are the act of the municipality'")(quoting *City of St. Louis v. Paprotnik*, 485 U.S. 112, 127 (1988)).

Furthermore, with regard to Malone's lack-of-supervision claim based upon prior Internal Affairs reports of excessive-force incidents, a plaintiff must also prove context for a court review of the number of prior incidents of complaints of excessive force. In *Peterson v. City of Fort Worth,* 588 F.3d at 851-52, the Fifth

Circuit determined that twenty-seven complaints of excessive force by officers of the Fort Worth Police Department over three years-- without further evidence placing that number in context--were insufficient to establish a pattern of excessive force. The court noted that the record did not indicate the size of the police department or how many arrests were made over the relevant time. *Id.* Likewise, in *Pineda v. City of Houston*, 291 F.3d 325, 329 (5th Cir. 2002), the Fifth Circuit held that "[e]leven incidents each ultimately offering equivocal evidence of compliance with the Fourth Amendment cannot support a pattern of illegality in one of the Nation's largest cities and police forces."*Id.* The five Internal Affairs complaints cited by Malone include one instance in 1999 and four instances from events in 2000; the two Internal Affairs written reprimands Malone references were from 2006 and 2009, respectively. (Pl.'s App. (doc. 283-1) 293-309.) Malone has not shown that records of these prior Internal Affairs complaints and written reprimands establish a pattern of Fort Worth failing to supervise it officers related to excessive force; thus, they do not demonstrate Fort Worth's deliberate indifference.

Moreover, with regard to the evidence presented by Malone of Tidwell's own prior excessive-force complaint that resulted in a lawsuit, this incident alone does not support municipal liability against Fort Worth for a failure to supervise Tidwell. The Court finds instructive a case where the Western District of Texas

rejected a claim of municipal liability against the City of San Antonio. The case arose from excessive force employed by one of the city's officers, McDaniel, in twisting and breaking the plaintiff's arm during her arrest, and evidence existed that McDaniel had been the subject of two prior complaints of excessive force:

> While Officer McDaniel has previously been under suspicion for the use of excessive police force, the summary judgment evidence is insufficient to create a dispute of material fact about the existence of a widespread pattern of excessive force condoned by the City. Plaintiff has established only two complaints (other than the present lawsuit) against Officer McDaniel since 2002. Plaintiff has not established how long Officer McDaniel has been on the police force, how many arrests he has made over the course of his career, how often an average police officer has complaints filed against him or her, and the frequency of arm injuries during arrest.

*Villasana v. City of San Antonio*, No. SA-13-CV-278-XR, 2014 WL 640965, at * 11 (W.D. Tex. 2014).

Similarly, here Malone relies upon only one prior incident of the use of excessive force by Tidwell. Malone has not provided any of the kinds of contextual evidence required for that one prior incident to support an inference that Fort Worth was deliberately indifferent. Fort Worth, however, has provided some information to put this prior incident in context, as it has provided Tidwell's Texas Commission on Law Enforcement Officer Standards and Education Report as of September 2013. (Fort Worth App.(doc. 278-4) at 1-7.) That record shows that, as of that date, Tidwell had been an officer with the Forth Worth police department since April 2001,

and had received (not including his pre-hire Police Academy training) over 660 hours of training. *Id.* at 1-5. Thus, Malone's evidence of Tidwell's one prior incident of the use of excessive force in the context of Tidwell's many years of service, without more, is not sufficient to establish that Fort Worth was deliberately indifferent to its failure to adequately supervise Tidwell, thus causing Malone's injuries. *See generally Fraire v. City of Arlington,* 957 F.2d 1268, 1278 (5th Cir. 1992)(holding that City's failure to discipline an officer for an isolated incident involving the use of force did not give rise to an inference that the city had a policy authorizing police misconduct).

In sum, the Court concludes that Malone has failed to establish a genuine dispute of material fact as to whether any failure by Fort Worth to supervise the canine officers, and in particular Officer Tidwell, was the result of deliberate indifference.[6]

---

[6]Although not argued and briefed by Malone in his response to the summary-judgment motion, Malone recites in his live pleading five other different prior incidents between 1998 and 2011 where officers allegedly used excessive force. (Pl.'s FAC (doc. 146) ¶¶ 134-135.) As noted in Section IV(B)(1) of this opinion, as none of these incidents involved the use of a canine, they provided no support for Malone's claim against Fort Worth based upon a policy of regular officer deference to canine officers. To the extent Malone relies upon these five prior incidents of excessive force in support of an additional theory of recovery against Fort worth under § 1983 based on a more general policy of deliberate indifference to the use of excessive force, Malone has also failed to raise a genuine dispute of material fact. As noted in the text above, in *Peterson,* the Fifth Circuit, in affirming this Court, explained that "[w]here prior incidents are used to prove a pattern, they 'must have occurred for so long or so frequently that the course of conduct warrant the attribution to the governing body of knowledge that the objectionable conduct is the expected, accepted practice of city employees.'" 588 F.3d at 850 (quoting *Webster v. City of Houston,* 735 F.2d 838, 842 (5th Cir. 1984)). In other words, the practice must be "'persistent and widespread.'" *Pineda,* 291 F.3d at 329 (quoting *Piotrowski,* 237 F.3d at 581.) The Fifth Circuit in *Peterson* concluded that twenty-seven

**V. State Law Claims--Sovereign Immunity--Texas Tort Claims Act**

Fort Worth also moves for summary judgment on Malone's state-law claims, contending that it enjoys immunity and that the asserted state-law claims are not authorized by the Texas Tort Claims Act ("TTCA"). Tex. Civ. Prac. & Rem. Code 101.021(2)(West 2011). Under the doctrine of sovereign immunity, a governmental unit, such as the City of Fort Worth, is not liable for the torts of its officers in the absence of a constitutional or statutory provision creating such liability. *Dallas Cty. Mental Health & Mental Retardation v. Bossley,* 968 S.W. 2d 339, 341 (Tex. 1998). The TTCA contains exceptions to this governmental immunity for certain damage claims arising from its governmental functions. As one court has explained:

> Under the doctrine of sovereign immunity, a governmental unit is not liable for the torts of its officers or agents in the absence of a constitutional or statutory provision creating such liability. *State v. Terrell*, 588 S.W.2d 784, 785 (Tex. 1979). The Texas Tort Claims Act ("TTCA") creates a limited waiver of sovereign immunity. See Tex. Civ. Prac. & Rem. Code Ann. § 101.021 (Vernon 1997). In order for immunity to be waived under the TTCA, the claim must arise under one of the three specific areas of liability for which immunity is waived, and the claim must not fall under one of the exceptions from waiver. *Alvarado v. City of Brownsville*, 865 S.W.2d 148,

---

incidents of police excessive force complaints between 2002 and 2005 would not establish a pattern of excessive force because the Fort Worth police department employed more than 1,500 officers and reported more than 67,000 instances of crime per year. *Peterson,* 588 F.3d at 851. Likewise, in this case, Malone's general recitation of five separate incidents of excessive force over the course of thirteen years is not sufficient evidence to raise a genuine dispute of material fact that Fort Worth generally has a policy of deliberate indifference to excessive force.

> 155 (Tex.App.-Corpus Christi 1993), *rev'd on other*
> *grounds*, 897 S.W.2d 750 (Tex.1995). The three specific
> areas of liability for which immunity has been waived
> are: (1) injury caused by an employee's use of a motor-
> driven vehicle; (2) injury caused by a condition or use
> of tangible personal or real property; and (3) claims
> arising from premise defects. See Tex. Civ. Prac. & Rem.
> Code Ann. § 101.021 (Vernon 1997). However, the waiver of
> immunity does not extend to claims arising out of
> intentional torts. See Tex. Civ. Prac. & Rem. Code Ann.
> § 101.057 (Vernon 1997).

*Medrano v. City of Pearsall*, 989 S.W.2d 141, 143-44 (Tex.App.-San Antonio 1999, no pet.).

In his live pleading, Malone alleges a claim against Fort Worth for injury caused by Tidwell's negligent use of his gun and his dog. Malone apparently contends that, for the purposes of invoking the waiver of immunity set forth in the TTCA, he has alleged an injury caused by the use of tangible personal property. *See* (Pl's FAC (doc. 146) 58-59(citing Tex. Civ. Prac. & Rem. Code § 101.021(2) (West 2011)).

But among the exceptions to the waiver of sovereign immunity is this: the TTCA does "not apply to a claim . . . arising out of assault, battery or other intentional tort . . . ." Tex. Civ. Prac. & Rem. Code Ann. § 101.057(2)(West 2011); *see Delaney v. Univ. of Houston*, 835 S.W. 2d 56, 59 (Tex. 1992). "This provision shields municipalities from suits arising out of intentional torts committed by governmental employees and should be liberally construed to accomplish this objective." *Gillum v. City of Kerrville*, 3 F.3d 117, 123 (5th Cir. 1993)(citations omitted).

40

Thus, even if immunity "is waived under section 101.021 of the TTCA, a claim is still prohibited if it falls within the section 101.057(2) exception." *Tarrant Cty. Hosp. Dist. v. Henry*, 52 S.W.3d 434, 441 (Tex. App.-Fort Worth 2001, no pet)(citing *Delaney*, 835 S.W.2d at 58). "T]he intentional tort exception cannot be circumvented merely by alleging that the government was negligent. . . ." *Harris Cty. v. Cabazos*, 177 S.W.3d 105, 111 (Tex. App.-Houston [1st Dist.] 2005, no pet)(citing *Delaney*, 835 S.W.2d at 60)). "If a plaintiff pleads facts which amount to an intentional tort, no matter if the claim is framed as negligence, the claim generally is for an intentional tort and is barred by the TTCA." *Cabazos,* 177 S.W. 3d at 111.

Here, the alleged conduct by Tidwell in striking Malone with his gun and permitting the canine to bite him amounted to intentional torts. Under Texas state law, courts have recognized that excessive-force claims amount to an intentional tort. *See generally City of Watauga v. Gordon,* 434 S.W. 3d 586, 594 (Tex. 2014)(noting that "[t]he Texas Tort Claims Act waives governmental immunity for certain negligent conduct, but it does not waive immunity for claims arising out of intentional torts, such as battery" and concluding that "[b]ecause Gordon alleges that police used excessive force in his arrest [applying handcuffs too tightly], [which is] a claim that arises out of a battery, his pleadings do not state a claim for which governmental immunity has

been waived under the Tort Claims Act"); *City of Waco v. Williams*, 209 S.W. 3d 216, 222-23 (Tex. App.--Waco 2006, pet. denied) (collecting cases and concluding that allegations of excessive force in repeated use of a taser amounted to an intentional assault tort); *City of Garland v. Rivera*, 146 S.W. 3d 334, 338 (Tex. App.--Dallas 2004, no pet)(concluding that a plaintiff's excessive-force claim arising from use of "pepper spray, handcuffs, [and] a K-9 police service dog" amounted to an intentional tort).

Federal courts in Texas have applied a similar analysis in concluding that the intentional-tort exception applies to excessive-force claims. *See, e.g., Gonzales v. City of Corpus Christi*, No. C.A. C-05-280, 2005 WL 3058168, at *11-12 (S.D. Tex. Nov. 9, 2005) (despite claim of alleged misuse of handcuffs and leg irons, "all of plaintiff's damages arise out of the claimed instance of excessive force"); *Holland v. City of Houston*, 41 F.Supp.2d 678, 713 (S.D.Tex.1999)("Where the essence of a claim under the TTCA arises from an intentional tort, allegations of negligence are insufficient to avoid the § 101.057 exception to liability"); *Huong*, 61 F.Supp. 1003, 1008-09 (E.D. Tex.1997)("Plaintiffs cannot circumvent the intentional tort exception to waiver of municipal liability by simply pleading negligence when the shooting event upon which they base their claims is actually an intentional tort.").

Having considered Malone's pleading of state-law claims

against Fort Worth based upon Tidwell's use of a gun and a canine to physically harm him, the Court concludes that he has alleged intentional torts. Intentional torts are excepted from the waiver of sovereign immunity under the TTCA. Thus, Fort Worth is cloaked with governmental immunity, and it is immune from Malone's state law claims. Consequently, Fort Worth's motion for summary judgment on these claims will be granted and the claims dismissed for lack of subject-matter jurisdiction. *See Tex Dep't of Transp. V Jones,* 8 S.W. 3d 636, 637 (Tex. 1997) (noting that governmental immunity from suit defeats a trial court's subject-matter jurisdiction).

## VI. CONCLUSION

For all of the above and foregoing reasons, Fort Worth's motion for summary judgment (doc. 275) is GRANTED, such that all of Malone's claims under § 1983 against Fort Worth are DISMISSED; and all of Malone's state-law claims against Fort Worth are DISMISSED for lack of subject-matter jurisdiction.

SIGNED March 2, 2018.

_Terry R. Means_
TERRY R. MEANS
UNITED STATES DISTRICT JUDGE